IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,          :
                                   :
          Plaintiff,               :
                                   :
     v.                            :     Criminal Action No. 06-118-JJF
                                   :
KEVIN L. PEARSALL,                 :
                                   :
          Defendant.               :

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO REQUEST A DAUBERT HEARING

Defendant, Kevin Pearsall ("Mr. Pearsall"), by and through his undersigned counsel, Christopher S. Koyste, respectfully submits this Memorandum of Law in support of his Motion To Request A Daubert Hearing to determine the admissibility of expert testimony at trial on the subject of gunshot residue. For the reasons set forth below, Mr. Pearsall seeks to exclude the Government's expert testimony and supporting evidence related to the presence of gunshot residue ("GSR") on Mr. Pearsall's hands and the subject firearm.

I.     **INTRODUCTION**

On October 24, 2006, Mr. Pearsall was indicted by the Grand Jury for the District of Delaware for being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). On January 17, 2007, Mr. Pearsall filed a Motion to Request A Daubert Hearing to determine the admissibility of the Government's expert testimony at trial on the subject of GSR. The grounds for Mr. Pearsall's motion related to his receipt of the Government's discovery, which

included test results and an expert opinion regarding the presence of GSR on Mr. Pearsall's hands.

On January 25, 2007, the Government sent a letter to the Defense, which contained additional documentation in relation to the RJ Lee Group Report, the Curriculum Vitae of the three signatories to the Report and a brief summary of its expert witness' anticipated testimony.  The Government noted in its letter that "(t)he witnesses' ultimate conclusion is that the defendant could have discharge[d] a firearm, [been] in close proximity to a discharging firearm, or had contact with a surface contaminated with GSR."

On February 6, 2007, Mr. Pearsall filed Proposed Findings of Fact and Conclusions of Law In Opposition to the Admission of the Government's Evidence In Relation to Gunshot Residue.  After this filing, the Government sent a letter to the Defense, which contained a March 2, 2007 Report from the RJ Lee Group.  In this Report, the RJ Lee Group concluded that "[p]articles confirmed as being unique-to and consistent-with GSR" were found on the subject firearm.

On March 16, 2007, this Court conducted a hearing pursuant to Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), which assigns trial judges with the task of ensuring that expert testimony is reliable and relevant.  At the conclusion of the hearing, the Court instructed Mr. Pearsall to file the instant Memorandum in support of his Daubert challenge.

Mr. Pearsall contends that the Government's expert testimony and supporting evidence regarding the presence of GSR on his hands should be excluded because they do not satisfy Rule 702's "reliability" and "fit" requirements.  Under these requirements, such testimony and evidence should be excluded because it relies on insufficient data, and the expert witness did not reliably apply his principles and methods to the specific facts of this case.  See also, Daubert, 509 U.S. at 579.  In the alternative, if the Court concludes that the Government's expert testimony and supporting

evidence is admissible under Rule 702, such testimony and evidence should be excluded under Rule 403 because the probative value is substantially outweighed by the danger of unfair prejudice, confusion and misleading the jury.

Mr. Pearsall further contends that the Government's expert testimony and supporting evidence related to the presence of GSR on the subject firearm should be excluded pursuant to Rule 402 because they are not relevant. In the alternative, if the Court concludes that the Government's expert testimony and supporting evidence is admissible under Rule 402, such testimony and evidence should be excluded under Rule 403 because the probative value is substantially outweighed by the danger of unfair prejudice, confusion and misleading the jury.

## II.    FACTUAL BACKGROUND

On August 5, 2006, the Dover Police Department received an anonymous telephone call[1] from an individual who alleged that she saw Mr. Pearsall fire a handgun several times before concealing it in his clothing. A few minutes later, the anonymous caller again contacted the police department, this time specifying Mr. Pearsall's location and stating that he had given the gun to a woman that was sitting next to him.

Police officers arrived at the scene and saw a woman and two men sitting together. Mr. Pearsall, who was one of the men, was immediately arrested, along with Anna Baez and Leslie Brown. The police officers searched Ms. Baez and found a 9mm semiautomatic pistol in her shorts.

The officers transported Mr. Pearsall to the police station and conducted a binary gunshot residue test on his hands. The test yielded a positive result on Mr. Pearsall's right hand, which

---

[1] The Government has indicated that it does not know the anonymous caller's identity.

indicated the presence of nitrates.  The officers subsequently swabbed Mr. Pearsall's right hand and left hand for additional samples for laboratory analysis.  In total, three samples were sent to the RJ Lee Group, Inc. for testing.

The RJ Lee Group's November 2, 2006 Report stated that an analysis of Mr. Pearsall's left hand sample confirmed only one particle unique to GSR, and an analysis of Mr. Pearsall's right hand sample confirmed one particle consistent with GSR.  The Report also stated that there were no GSR particles found on the presumptive swab of Mr. Pearsall's right hand.

The RJ Lee Group also performed an analysis of the subject firearm.  In its March 2, 2007 Report, the RJ Lee Group concluded that the subject firearm contained numerous particles unique to, and consistent with, GSR.


III.    **MARCH 16, 2007 MOTION HEARING & DAUBERT HEARING**

On March 16, 2007, this Court held a Daubert hearing to determine whether the Government's expert testimony is admissible pursuant to Rule 702.  At the hearing, the Government presented two witnesses: (1) Officer Paul Kunzi, the arresting officer; and (2) Alford Schwoeble, Director of the RJ Lee Group's Forensic Science Department.  Mr. Pearsall presented John Kilty, a forensic science consultant. [2]


A.  **Officer Paul Kunzi's Testimony**

Officer Paul Kunzi testified about the circumstances surrounding Mr. Pearsall's arrest and

---

[2]  Mr. Pearsall also presented Sean Williams, an investigator for the Federal Public Defender's Office.  Mr. Williams' testimony, however, is not relevant to the gunshot residue issue.

GSR testing.  Officer Kunzi stated that he received two radio dispatches, which reported two anonymous phone calls stating that Mr. Pearsall had fired and concealed a gun, before giving it to a woman that was sitting next to him at a specific location.

Officer Kunzi reported to the scene and simultaneously arrived with Officers Muscemici and Bumgarner.  Tr. at 17.  Officer Kunzi testified that Officer Bumgarner was the first to approach Mr. Pearsall, Ms. Baez and Mr. Brown, and that he immediately recognized Mr. Pearsall because of a prior arrest.  Tr. at 17.  Officer Kunzi testified that Officer Bumgarner claimed to have observed a bulge in Ms. Baez's pants as he approached her, and that she refused to stand up at his request. When Ms. Baez finally stood, she grabbed her waistband, which prompted Officer Bumgarner to take Ms. Baez to a grassy area and into custody.  Tr. at 20.

Officer Kunzi arrested Mr. Pearsall, and Officer Muscemici arrested Mr. Brown.  According to Officer Kunzi, although Officer Bumgarner recovered a Vector 9mm gun from Ms. Baez, he believed that the gun belonged to Mr. Pearsall because of the two anonymous phone calls.  Tr. at 21. Officer Kunzi stated that he placed Mr. Pearsall into the back of his patrol vehicle and transported him to Dover Police Department Headquarters.  Tr. at 22.  Upon arriving at headquarters, Officer Kunzi testified that he placed Mr. Pearsall  into a group holding facility, where he continued to remain in handcuffs.  Tr. at 22.

Officer Kunzi testified that he retrieved Ms. Baez from her holding cell and interviewed her for approximately 15 minutes.  Tr. At 26-27.  During the interview, Ms. Baez stated that Mr. Pearsall had given her the gun and asked her to hold it for him.  Officer Kunzi did not test Ms. Baez's hands or clothing for gunshot residue testing.  Tr. at 26-27.  Officer Kunzi acknowledged that he touched the same surfaces as Ms. Baez, such as doorknobs and the interview table, and was in close contact

with her for the entire time that he interviewed her.  Tr. at 57, 62.

After Officer Kunzi interviewed Ms. Baez, he returned to the group holding facility and performed a binary gunshot residue test on Mr. Pearsall's hands in the group holding facility.  Tr. at 28-29.  Officer Kunzi selected Mr. Pearsall's right hand as his presumptive hand because he believed that Mr. Pearsall was right-handed and would shoot with this hand.[3]  Officer Kunzi testified that the presumptive swab was taken on the inside of Mr. Pearsall's right hand, which testified positive.  Tr. at 31.  Officer Kunzi then took one additional swab from Mr. Pearsall's right hand and one swab from Mr. Pearsall's left hand.  Tr. at 29-35.

Officer Kunzi conceded that he did not test or protect Mr. Pearsall's hands at the scene by bagging them, did not wash his hands or arms prior to testing, did not remove Mr. Pearsall from the group holding cell to a clean, sterile environment for testing and that Mr. Pearsall's hands came in contact with the fabric from the backseat of his patrol car.  Tr. at 52, 54-55.  Officer Kunzi further admitted that he had never been trained in GSR evidence gathering, that Mr. Pearsall's testing was the first time that he had performed the binary gunshot residue test and that the holding cell routinely contained several individuals at one time, some of whom had been arrested for firearm offenses.  Tr. at 31, 51, 54-55.   Finally, Officer Kunzi testified that he could not recall the last time that he had cleaned his handcuffs or utility belt, and that the responding officers did not recover any shell casings or detect bullet holes at the scene.  Tr. at 51-56.

---

[3] Officer Kunzi testified that this belief was based on his prior arrest of Mr. Pearsall, and that Mr. Peasall had used his right hand to complete police paperwork during the intake process. Tr. at 31.

B.    **Alford J. Schwoeble's Testimony**

Alford Schwoeble, the Government's expert witness, testified about his laboratory analysis of the samples received from the Dover Police Department. Mr. Schwoeble confirmed his conclusion that "particles confirmed as being unique to or consistent with GSR could have resulted from the discharge of a firearm, being in close proximity to a discharging firearm or from contact with a surface contaminated with GSR." Tr. at 88. Mr. Schwoeble testified that his conclusion conformed with the FBI Symposium papers. Tr. at 89.

Mr. Schwoeble also confirmed his Report's conclusion that a "particle confirmed as being unique to [,] and particles confirmed [as] being consistent with[,] GSR were found on the left hand," and a "particle confirmed as being consistent with GSR was found on right hand." Tr. at 92. Mr. Schwoeble stated that he was able to testify with certainty that the unique particle on Mr. Pearsall's left hand was gunshot residue, but that he could not testify as to how that particle could have gotten onto Mr. Pearsall's hand. Tr. at 92. Although Mr. Schwoeble testified that his lab takes proper procedures to ensure that the testing kit's integrity is maintained, he acknowledged that police stations are typically environments that come in contact with GSR, as well as police automobiles, police handcuffs and police holding rooms. Tr. at 100. Mr. Schwoeble conceded that a person taking a GSR sample should have clean hands and arms, should use clothing that is free of GSR and should collect and take swabs in an area that he or she knows is free of GSR. Tr. at 101.

Mr. Schwoeble also testified that he performed an analysis of samples from the subject firearm and found many particles unique to, and consistent with, GSR on the weapon. Mr. Schwoeble did not offer any further conclusions regarding the significance of GSR on the subject firearm. Tr. at 87-88.

### C.    John Kilty's Testimony

Mr. Pearsall presented John Kilty, a forensic science consultant and former Chief of the FBI's Gunshot Residue and Metals Analysis Unit.  Mr. Kilty reviewed Mr. Schwoeble's reports and did not disagree with his "boilerplate conclusions."  Tr. at 111.  Mr. Kilty, however, took issue with Mr. Schwoeble's opinion regarding the finding of one particle of GSR under the specific circumstances of this case.  Mr. Kilty explained that he generally reviews the scientific findings to determine whether he agrees with the elemental identifications and the structure identifications that were made by the analyst, and then reviews the case situation to determine what happened at the scene or time of the incident and what happened at the time that swabs were taken for testing.  Tr. at 111-112.  Mr. Kilty testified that, after reviewing all of this information, he disagreed with Mr. Schwoeble's findings because of the time differential between the alleged shooting and the various activities that transpired between the time that Mr. Pearsall was arrested and his hands were sampled.  Tr. at 112.

Mr. Kilty stated that, where the Dover Police Department did not take proper precautions or use accepted guidelines for the preservation of samples from Mr. Pearsall's hands, he had no confidence that a single particle of unique GSR could be associated with the alleged shooting of a weapon by Mr. Pearsall.  Tr. at 113.  Mr. Kilty also explained that contamination in laboratories and police departments was an issue, and that the FBI's own laboratory experienced contamination problems.  Tr. at 114.

Mr. Kilty also testified that the FBI's threshold level for GSR was three unique particles, but he made clear that he did not take issue with the number of particles found by Mr. Schwoeble. Rather, Mr. Kilty took exception to the significance of such findings as applied to the specific circumstances of this case.  Tr. at 121-122.  In response to the Government's cross-examination

8

regarding the significance of the presence of one unique particle versus three unique particles, Mr.

Kilty stated:

> Q:    So it is fair to say that if you have three particles that's still no guarantee
> either?
>
> A:    It is not a guarantee, of course not, but it's certainly – if, for instance, in a
> situation if I find a report – if I review a report and it has located five unique
> particles and a dozen or so consistent particles on the person's hands and the
> report was worded like Mr. Schwoeble's report is, no one hears about me in
> court [because] I have no value for the defense or anybody else in that case,
> because there is a lot of particles there, and that is not an unusual thing that
> secondary transfer would produce.  That if you have a lot of particles, the
> primary shooting environment is much more likely tha[n] accidently finding
> one particle, based on all of the kinds of things that the person goes through
> from the alleged shooting to the time that the person is sampled.

Tr. at 124.  Mr. Kilty further explained that he suspected that the RJ Lee Group writes the same

report for a one particle identification as it does for eight to ten particle identifications, and that the

scientific community is split on how to report a single particle identification.  Tr. at 129-130.  Mr.

Kilty concluded that, based on a totality of the circumstances, the finding of a single particle in this

case cannot be confidently associated with the firing of a weapon, and that a forensic analyst should

consider the totality of the circumstances and not draw "boilerplate conclusions."  Tr. at 131-132.


C.    **The 2005 FBI Symposium**

Both experts rely on findings from the FBI's 2005 Gunshot Residue Symposium.  At this

Symposium, approximately 40 scientists representing local, state, federal, international and private

laboratories gathered to discuss topics relevant to the detection and significance of GSR analyses.

The Symposium's mission was to establish guidelines for the acceptance, practices and interpretation

of gunshot residue examinations that are primarily conducted by scanning electron microscopy with

energy dispersive X-ray spectrometry detection (SEM/EDS).  Key findings from the Symposium

include:

1.  All participants agreed that GSR sampling should be done at the scene, where permissible, and as expeditiously as possible;

2.  With respect to sampling and transfer concerns, the majority agreed that it would be best to sample a subject's hands before bagging the hands or placing the subject in a police vehicle;

3.  It was also agreed that armed law enforcement officers can transfer GSR particles to a subject through contact;

4.  Almost all participants agreed that if the subject's hands cannot be sampled before placing the subject in a police vehicle, the subject's hands should be bagged in order to prevent possible contamination;

5.  To the extent possible, all used cartridges and/or firearms should be kept away from GSR sampling kits, the area where sampling will take place and the area of the laboratory where GSR analyses are performed;

6.  The majority agreed that it is possible for a handcuffed person's hand to be contaminated by the prior presence of GSR in the backseat of a police vehicle.  If asked by a court how likely it is for hands to be contaminated in the backseat of a police vehicle, most GSR experts would answer, "I don't know."  Several symposium participants offered studies supporting the possibility of GSR transfer from a police vehicle's backseat to an individual;

7.  It was widely agreed that the average person who is not exposed to firearms or ammunition or its components will not be found to have GSR particles on the hands;

8.  The majority "overwhelmingly agreed" that particles can transfer from one surface to another, and that bystanders (e.g. a person present at the time of the shooting who does not come into direct contact with the shooter, firearm or any other surface potentially contaminated with GSR) can test positive for GSR;

9.  Given GSR's ease of transfer, routine monitoring of the work environment should be included in a laboratories standard protocol for GSR testing;

10.  All of the scientists stated that they recommend that samples be collected from an individual's hands as quickly as possible, and that laboratories may elect not to analyze lifts from hands of live subjects 4 to 12 hours after the event in question; and

11.  Most experts felt that even one particle is enough for a "positive" result; however almost all of the attending experts agreed that GSR particles alone cannot be attributed to a particular shooting event, and it is understood that GSR particles cannot be used to distinguish between shooters and bystanders.

See Summary of the FBI Laboratory's Gunshot Residue Symposium at 1, 4-7 (2005).

## IV.  **DISCUSSION**

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence ("Federal Rules"), which places a "trilogy of restrictions on expert testimony: qualification, reliability and fit." Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316 (3d Cir. 2003) (citation omitted); see also Daubert, 509 U.S. at 579; Kuhmo Tire Co., Ltd., v. Carmichael, 526 U.S. 137 (1999).  Rule 403 of the Federal Rules balances Rule 702 by excluding expert testimony that would otherwise be admissible under Rule 702 because of the danger of unfair prejudice, confusion and misleading the jury.

Mr. Pearsall does not challenge the general science behind GSR testing.  In this case, however, the Government's expert testimony and supporting evidence regarding the presence of GSR on Mr. Pearsall's hands do not satisfy Rule 702's "reliability" and "fit" requirements.  Rather, the expert opinion relies on insufficient data and did not reliably apply the scientific principles and methods to the specific facts of this case.  Here, the testing samples used to support the expert's opinion were not collected pursuant to the scientific community's suggested control standards, which exposed the samples to high risk of contamination.  The expert's analysis, which claims to rely on the FBI Symposium, runs counter to a totality of the FBI Symposium's findings because he did not account for the Dover Police Department's failure to adhere to the FBI Symposium's evidence

11

gathering protocols.  Instead, the expert issued a boilerplate opinion regarding the presence of GSR on Mr. Pearsall's hands.

Thus, the Government's expert testimony and supporting evidence related to the presence of GSR on Mr. Pearsall's hands should be excluded under Rule 702.  The Government's expert opinion does not distinguish between evidence that would suggest that Mr. Pearsall fired a gun, and evidence that would suggest that Mr. Pearsall did not fire a gun.  Rather, the expert's opinion lumps all possible scenarios together, which has the effect of categorizing exculpatory evidence with incriminating evidence.  In the alternative, if the Court determines that the expert testimony and supporting evidence satisfy Rule 702's requirements, such testimony and evidence is inadmissible under Rule 403 because they are highly prejudicial and would confuse or mislead the jury.

Mr. Pearsall also submits that the Government's expert testimony and supporting evidence regarding the presence of GSR on the subject firearm should be excluded under Rule 402 because they are not relevant.  The expert testimony and supporting evidence only demonstrate that there are gunshot particles on the firearm, and do not offer any general or specific conclusions regarding the significance of these findings to the alleged shooting in this case.  In the alternative, if the Court determines that the Government's expert testimony and evidence regarding the presence of GSR on the firearm is relevant under Rule 402, such testimony and evidence is inadmissible under Rule 403 because it is highly prejudicial and would confuse or mislead the jury.

**A.    The Government's Expert Witness Testimony And Supporting Evidence Related to The Presence of Gunshot Residue on Mr. Pearsall's Hands Should Be Excluded Pursuant to Rule 702 of the Federal Rules of Evidence.**

In 2000, Congress amended Rule 702 of the Federal Rules of Evidence, which governs the

use of expert testimony, to incorporate the standards set forth in <u>Daubert</u> and its progeny. Rule 702's amendment "affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony." Fed.R.Evid. 702 advisory committee's note.

> Rule 702 states:
>
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

<u>Id.</u>; <u>see</u> <u>also</u>, <u>Daubert</u>, 509 U.S. at 597 (stating that Rule 702 assigns to the trial judge the "task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand"); <u>Kuhmo Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137 (1999) (extending <u>Daubert's</u> "gatekeeping" obligation to all expert testimony).

In <u>Daubert</u>, the Supreme Court discussed several non-exclusive factors that may assist district courts in deciding whether an expert's testimony is reliable. These factors are:

> (1) Whether the theory or technique can be and has been tested;
>
> (2) Whether the theory or technique has been subjected to peer review and publication;
>
> (3) The technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and
>
> (4) The technique's general acceptance within a relevant scientific community.

<u>Id.</u> at 594. The Court noted that Rule 702's inquiry is a flexible one, and that the focus must be "solely on principles and methodology, not on the conclusions that they generate." <u>Id.</u>

In <u>Kuhmo</u>, the Supreme Court stated that Rule 702 requires "a valid . . . connection to the pertinent inquiry as a precondition to admissibility. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline." <u>Id.</u> at 149 (citations omitted) (recognizing expert testimony that is specific to the relevant issue before the court as opposed to general reasonableness theories).

Shortly after the Supreme Court decided <u>Daubert</u>, the Third Circuit applied its analysis in <u>In Re Paoli Railroad Yard PCB Litigation</u>, 35 F.3d 717 (3d Cir. 1994) ("<u>Paoli II</u>"). In <u>Paoli II</u>, the Third Circuit affirmed its prior reliability analysis in <u>United States v. Downing</u>, 753 F.2d 1224 (3d Cir. 1985), which identified additional reliability factors: (1) the degree to which the expert witness is qualified; (2) the relationship of the technique to more established modes of scientific analyses; and (3) the non-judicial uses to which the scientific technique are put. The Third Circuit stated that a "district court should take into account all of the factors listed by either <u>Daubert</u> or <u>Downing</u> as well as any others that are relevant," and noted that the requirement of reliability, or "'good grounds,' extends to every step of the expert's analysis, 'all the way through the step that connects the work of the expert to the particular case.'" <u>Id.</u> at 742-43.

In addition to reliability, Rule 702 requires that the expert's testimony must assist the trier of fact. In <u>Daubert</u>, the Supreme Court stated that "[f]it is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." <u>Id.</u> at 591. In essence, "admissibility depends in part upon the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case." <u>Paoli II</u>, 35 F.3d at 742-743, quoting <u>Downing</u>, 753 F.2d at 1237. Thus, "Rule 702's 'helpfulness' standard requires a

valid <u>scientific</u> connection to the pertinent inquiry as a precondition to admissibility." <u>Paoli II</u>, 35 F.3d at 742-743 (emphasis in original).

Mr. Pearsall recognizes Mr. Schwoeble's qualifications and acknowledges the general science behind GSR testing. But where, as here, the foundational data underlying the expert's testimony is insufficient, the expert's testimony is rendered unreliable. <u>See</u> Fed.R.Evid. 702 Moreover, Mr. Schwoeble's expert testimony would not assist the trier of fact because he did not reliably apply the scientific principles and methods to the specific facts of this case. <u>Daubert</u>, <u>Kuhmo</u>, <u>Downing</u> and <u>In Re Paoli II</u> require the Government's expert to not offer general, boilerplate conclusions regarding the presence of GSR in this case but, rather, to connect his work to the specific facts of this case. <u>See</u>, <u>In Re Paoli II.</u>

Here, the record is replete with examples of the Dover Police Department's failure to exercise the proper standards controlling the collection of GSR testing samples. An officer, totally ignorant of the necessary protocols regarding the collection of testing samples, conducted the test of Mr. Pearsall's hands. The officer did not test or bag Mr. Pearsall's hands at the scene, but placed him into the back of a patrol car that could contain GSR. The officer then placed Mr. Pearsall into a holding cell with other individuals that may have had contact with GSR, and subsequently interviewed and had close contact with the suspect who was in actual possession of the firearm. Finally, the officer did not wash his hands before performing the binary gunshot residue test on Mr. Pearsall's hands in the group holding cell instead of in a clean, sterile environment.

The Government's expert acknowledged these failures but did not account for the impact of these variables in making his analysis. Instead, the Government's expert claims that he has a sufficient basis for his opinion based upon the majority of the FBI Symposium participant's findings that one

particle unique to GSR is sufficient to report a positive result. Viewing the FBI Symposium's findings in its entirety, however, it is specious for the Government's expert to claim in this case that a single particle is enough to support his opinion, when the evidence gathering techniques that were used to collect the testing samples do not follow the FBI Symposium's protocols. The Government's expert cannot base his opinion on one component of the FBI Symposium while ignoring numerous other findings that undermine his opinion.

The Government's expert has offered three general conclusions that are, essentially, non-conclusions under the specific facts of this case. Merely regurgitating conclusions that conform with the FBI Symposium's suggested qualifying statement, while not applying the analysis in light of the FBI Symposium's suggested protocol for collecting testing samples and the effect of contamination on the underlying data, does not satisfy Rule 702 or <u>Daubert</u> and its progeny.

In its Proposed Findings of Fact and Conclusions of Law Regarding Gunshot Residue Testing, the Government relies on caselaw that is distinguishable from the instant facts. For example, in <u>United States v. Trala</u>, 386 F.3d 536 (3d Cir. 2004), the Third Circuit affirmed the District Court's admission of an expert's DNA testimony where the District Court's "painstaking opinion" provided a "thorough and compelling analysis" of the defendant's challenges to DNA evidence.[4] <u>Id.</u> at 541. <u>Trala</u>'s significance to this case, however, is its affirmance of the trial court's discretion to accept or reject expert testimony.

In <u>United States v. Caldwell</u>, 182 Fed. Appx. 227 (4th Cir. 2006), the Fourth Circuit

---

[4] In the underlying opinion, the District Court carefully examined the <u>Daubert</u> and <u>Downing</u> factors in assessing the admissibility of an expert on DNA testing. The court specifically determined that the government presented ample evidence that the protocol for the analysis at issue contained substantial controls and procedures for preventing contamination. <u>United States v. Trala</u>, 162 F.Supp.2d 336 (D.Del. 2001) (J. Sleet).

determined that the trial court did not err in finding that the defendant used a firearm in the commission of another felony offense because: (1) a witness testified that she saw a man fire a weapon in his truck and immediately brought the police to the scene; (2) the police discovered fresh shell casings from the defendant's gun at the scene; and (3) a trace evidence expert testified that GSR was found in the interior of the defendant's truck. Significantly, it does not appear that the defendant made a Daubert challenge to the trace evidence and other ballistic evidence.[5] See also, United States v. Simpson, 2007 WL 163053 (4th Cir. 2007) (rejecting defendant's argument that the government's closing argument, as it pertained to GSR testing, was improper); Herrera v. Lamaster, 149 Fed. Appx. 791 (10th Cir. 2005) (rejecting defendant's argument that the admission of a bullet, clip and casing had a substantial and injurious effect on the jury because it was the only physical evidence introduced in the government's case, where five eyewitnesses testified to the events surrounding a shooting); Bell v. Bell, 460 F.3d 739 (6th Cir. 2006) rehearing en banc granted, (Dec. 2006) (considering Brady v. Maryland, 373 U.S. 83 (1963) and Strickland v. Washington, 466 U.S. 668 (1984) challenges); United States v. Graves, 465 F.Supp.2d 450 (E.D. Pa 2006) (admitting the testimony of the defendant's expert witness as reliable where the government conceded its admissibility during the preliminary hearing).

The Government also cites two cases that it alleges supports the admission of GSR testing. In United States v. Paloscio, No. 99 C.R. 1199, 2002 WL 1585835, at *1 (S.D.N.Y., July 17, 2002), the court denied the defendant's motion for the exclusion of expert testimony regarding the presence

---

[5]  In the defendant's appellate brief, his challenges to the gun concerned the fact that there was no evidence that he was at the scene at the time of the shooting, and that his shell casings were likely at the scene because he was a gun enthusiast. Brief of Appellant at *10-11, No. 05-5019, United States v. Caldwell, (4th Cir. Jan. 10, 2006).

of GSR in an automobile because defendant's challenges went to the weight of the expert's testimony. It does not appear, however, that defendant raised a <u>Daubert</u> challenge, and that contamination was present in that case.

In <u>United States v. Bonugli</u>, 162 Fed. Appx. 326 (5th Cir. 2006), the defendant raised a Rule 403 challenge to witness testimony and GSR evidence, arguing that the officer who handcuffed him may have transferred the GSR particles. The court rejected this argument because it found that the evidence related to the shooting in question was "inextricably intertwined with the charged conspiracy" because it placed the defendant at the scene immediately prior to the discovery of the drugs. The court also determined that the defendant's challenge to the GSR went to the weight of the evidence, but it does not appear that the defendant raised a <u>Daubert</u> challenge to the GSR.

Although the Supreme Court and Third Circuit identified a non-exhaustive list of factors that courts should consider in assessing the admissibility of an expert's testimony, the Supreme Court explicitly recognized a concern for a technique's known error rate and the existence of standards to control the technique's operation. The relevant scientific community has recognized the problem of contamination on GSR testing samples and specifically addressed this issue at the 2005 FBI Symposium. None of these controls were in place when the Dover Police Department collected samples from Mr. Pearsall's hands, and the Government's expert conceded the proper control standards that should have been utilized in this case.

The expert, however, did not apply his scientific principles and methods to the facts of this case. Indeed, the expert would have likely rendered the same conclusion regarding his analysis of the presence of GSR on Mr. Pearsall's hands, regardless of whether he found one particle or eight particles of GSR. Accordingly, the Government's expert testimony and supporting evidence related

to the presence of GSR on Mr. Pearsall's hands should be excluded because it is not reliable and will

not assist the trier of fact in deciding the specific facts of this case.

       **B.**     **The Government's Expert Witness Testimony And Supporting Evidence Related to The Presence of Gunshot Residue on Mr. Pearsall's Hands Should Be Excluded Pursuant to Rule 403 of the Federal Rules of Evidence.**

In <u>Daubert</u>, the Supreme Court noted that the admission of expert testimony under Rule 702

is further balanced by Rule 403 of the Federal Rules, which permits the exclusion of relevant evidence

"if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the

issues, or misleading the jury...." Fed.R.Evid. 403. The Court stated that "[e]xpert evidence can be

both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the

judge[,] in weighing possible prejudice against probative force under Rule 403 of the present rules[,]

exercises more control over experts than over lay witnesses." <u>Id.</u> at 595 (citation omitted).

In <u>State v. Jason Moua</u>, No. K5-05-7335 (Minn. 2006), a state court excluded Mr.

Schwoeble's testimony because it determined that the relevant scientific community does not have

a generally accepted standard for interpreting the conclusions that can be drawn from GSR testing

and its analysis. Mr. Kilty also testified in <u>Moua</u>, and the court noted that both experts agreed that

"significant questions exist in the relevant scientific community concerning how many particles are

required for there to be a positive test result." A key part of the court's analysis was that the

scientific community agrees that a positive test result will only conclude that a person has been in the

environment of GSR.

Significantly, the court also determined that because of contamination issues present in that

case, which are similar to the instant case, the state failed to establish that the administration of the tests conformed to the procedures necessary to ensure reliability. The court stated that the officers' collection methods weighed heavily on the reliability of the samples, and it did not believe that the gunshot evidence present in that case "would add any precision or depth to the jury's ability to conclude whether or not the defendant fired a gun, was present when a gun was fired, handled a gun or ammunition, or picked up the [gunshot residue] from the back of a squad car, a police officer's hands . . . from another person detained . . ., from the handcuffs, or from any other source not mentioned . . . ." Id. at 23. The court rejected the admissibility of the GSR evidence under Rules 702 and 403.

Mr. Pearsall submits that for the reasons outlined by the Moua court, admissibility of the Government's expert testimony and supporting evidence regarding the presence of GSR on Mr. Pearsall's hands is highly prejudicial and would confuse or mislead the jury. When Mr. Pearsall was arrested, he was not in possession of the gun, and the Dover Police Department failed to test the suspect that was in actual possession of the gun to determine if GSR was present on her hands. Further, no shell casings or bullet holes were detected at the scene to support the alleged shooting that would result in possible GSR on Mr. Pearsall's hands.

Instead, the Government asks the Court to rely on an untested suspect's self-serving admission, while presenting scientific evidence that relies on insufficient data and raises a variety of conclusions regarding Mr. Pearsall's possible contact with a firearm. For example, one of Mr. Schwoeble's conclusions is that Mr. Pearsall could have been in contact with a surface contaminated with GSR. This contamination could come from holding a gun, being tested in a group holding cell that contains other individuals who may have had contact with a firearm or from the backseat of the

arresting officer's patrol car.  The Government's expert testimony will only raise a series of conclusions that would be highly prejudicial, confusing or misleading to the jury in the absence of actual possession of the weapon by Mr. Pearsall and the expert witness' reliance on insufficient data and failure to reliably connect his scientific principles and methods to the specific facts of this case.

    **C.**    **The Government's Expert Testimony and Supporting Evidence Related to the Presence of Gunshot Residue on the Firearm in Question Should Be Excluded Pursuant to Rule 402 and Rule 403.**

Rule 402 of the Federal Rules states that all "evidence which is not relevant is not admissible." Fed.R.Evid. 402.  Rule 401 defines relevant evidence as having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  Fed.R.Evid. 401.  Thus, Rule 402's basic standard of relevance is a liberal one, admitting any evidence that is relevant.  See Daubert, 509 U.S. at 592.  Rule 402, however, is limited by Rule 403, and should be read with Rule 702 regarding the admissibility of expert testimony.  See Downing, 753 F.2d at 1235.

Here, the admission of the Government's expert testimony and evidence related to the presence of unique particles of GSR on the subject firearm is not relevant to the facts of this case.  The expert testimony offers only factual conclusions regarding the presence of gunshot particles on the subject firearm, and the Government has offered no other evidence that ties the subject firearm to the alleged shooting or Mr. Pearsall.  The Government's expert testimony and supporting evidence does not make it more or less probable that the subject firearm was fired on the night Mr. Pearsall was arrested or was fired or possessed by Mr. Pearsall on the night he was arrested.

Moreover, the admission of this expert testimony and supporting evidence would be highly prejudicial, confusing and misleading to the jury because Mr. Pearsall was not in actual possession of the gun at the time of arrest. Neither shell casings, bullet holes nor other evidence was detected by the Dover Police Department at the scene that can specifically identify this firearm as the firearm that was used in the alleged shooting. Instead, the Government can only rely on two witnesses: an anonymous phone caller that cannot be confronted regarding her alleged claims that Mr. Pearsall fired a gun and gave it to Ms. Baez; and Ms. Baez, a witness with self-serving interests. Cf. Herrerra v. Lemaster, 149 Fed. Appx. at 791 (rejecting defendant's challenge to the injurious effect of the admission of physical evidence, where gunshot residue test was inconclusive because independent evidence of guilt was established by five eyewitnesses, three of whom saw defendant with a gun at scene of crime) (emphasis added). Accordingly, the Court should exclude the Government's expert testimony and supporting evidence related to the presence of GSR on the subject firearm.

## V.    **CONCLUSION**

The Court should exclude the Government's expert testimony and supporting evidence related to the presence of GSR on Mr. Pearsall's hands because such testimony and evidence relies on insufficient data, and the expert's opinion does not reliably apply his principles and methods to the facts of this case pursuant to Rule 702. In the alternative, such evidence and testimony should be excluded pursuant to Rule 403 because the expert testimony and related evidence would be highly prejudicial, confusing or misleading to the jury. Additionally, the Government's expert testimony and supporting evidence regarding the presence of GSR on the subject firearm is not relevant to the facts of this case pursuant to Rule 402, and would be highly prejudicial, confusing or misleading to the jury

pursuant to Rule 403.

Accordingly, the Court should exclude all expert testimony and supporting evidence related to the presence of GSR on Mr. Pearsall's hands and the subject firearm.

Respectfully submitted,

/s/ Christopher S. Koyste
Christopher S. Koyste, Esquire
Assistant Federal Public Defender
Tieffa N. Harper, Esquire
Research & Writing Attorney
704 King Street, Suite 110
Wilmington, Delaware  19801
(302) 573-6010
Email: ecf_de@msn.com
Attorney for Kevin Pearsall

DATED: April 9, 2007

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that the attached filing of Defendant Pearsall is available for public viewing and downloading and was electronically delivered on April 9, 2007 to:

Edmond Falgowski, Esq.

Assistant United States Attorney

1007 Orange Street, Suite 700

Wilmington, Delaware 19801


 /s/ Christopher S. Koyste

Christopher S. Koyste, Esquire

Assistant Federal Public Defender

704 King Street, Suite 110

Wilmington, Delaware  19801

(302) 573-6010

Email: ecf_de@msn.com

Attorney for Kevin Pearsall