IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 06-118-JJF |
| | ) | |
| KEVIN L. PEARSALL, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF
ITS PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This Memorandum is submitted in support of the Government's proposed Findings of Fact and Conclusions of Law regarding the admissibility of gunshot residue testing.

## I. **The Facts**

### A. **The Arrest**

On Saturday, April 5, 2006, at approximately 1:50 a.m., the Dover Police Department dispatcher received an anonymous telephone call advising that in the area of Capital Green, a public housing project in Dover, Delaware, "Kevin Pearsall" fired a handgun "five" times into the air. T.10-13, 16. The caller further reported that "Kevin Pearsall" was wearing a white tee shirt and shorts and placed the handgun in the waistband of his shorts. T.13. The dispatcher stayed on the phone with the caller and instantaneously relayed by radio the information to Corporal Paul Kuntzi, a ten year veteran assigned to the patrol unit, and to Patrolman Bumgarner and Musemici. T.10, 15-16. Cpl. Kuntzi was near the area and quickly responded. T.15. The three officers drove separate cars. T.17.

Upon arriving at the specified area, Cpl. Kuntzi began looking for Pearsall. T.15. Cpl. Kuntzi was familiar with Pearsall, having arrested him five days earlier, on August 1, 2006, in the same housing authority area, for an outstanding capias issued by the Superior Court for the State of Delaware and charging a violation of probation, and also for disorderly conduct and trespassing at Capital Green.[1] T.23-24, 66.

Two to three minutes after the initial call, the same anonymous caller again contacted the Dover P.D. dispatcher and reported that "Kevin Pearsall" had passed his handgun off to a female wearing a white tee shirt and shorts, and that both were sitting next to one another on steps in front of 459 New Castle Avenue. T.14. Again, this information was instantly relayed to the officer on the scene. T.14. Cpl. Kuntzi drove directly to the referenced address and arrived there in ten seconds. T.15, 17. Cpl. Kuntzi found Pearsall sitting on the referenced steps,[2] and wearing the described clothing. See photo, Government Exhibit (Gov. Ex.) 1; T.35. To Pearsall's left and sitting immediately next to him on the step was a woman, later identified as Anna Baez, also wearing the clothing described by the anonymous caller. See Photo, Gov. Ex. 1; T.18, 35.

Also arriving at that time were Officers Bumgarner and Musemici. T.17. Officer Bumgarner was the first officer to approach the steps. As he did so, Cpl. Kuntzi was approximately 10 - 15 feet behind Officer Bumgarner. T.19. Officer Bumgarner observed that Baez had an object concealed in the front of her shorts and told her two or three times to stand up. T.20. At this time, Cpl. Kuntzi was scanning the area in search of the gun reported by the anonymous caller. T.19. When Baez

---

[1] On March 3, 2000, Pearsall was banned from Capital Green.

[2] The steps in question are adjacent to the public sidewalk. The photos offered into evidence by Pearsall at the evidentiary hearing depict the steps approximately 10-15 feet from the front door to 459 New Castle Avenue.

2

finally stood up, she grabbed at the object in her shorts. T.20. Officer Bumgarner then forced Baez

to the ground and took from her an unloaded 9mm, semi-automatic pistol that was tucked into the

front waistband of her shorts. T.20-21. Seeing Officer Bumgarner take the handgun from Baez,

Cpl. Kuntzi then arrested Pearsall. T.18, 21. Cpl. Kuntzi had concluded that the handgun taken

from Baez was the same handgun that minutes before Pearsall had fired into the air, placed in his

waistband, and passed off to Baez. T.21. Upon arrest Pearsall was intoxicated. He had a strong

odor of alcohol, his eyes were glassy and bloodshot. T.23. Cpl. Kuntzi handcuffed Pearsall at the

scene of the arrest and transported him in the backseat of a patrol car to the police headquarters

where Cpl. Kuntzi placed Pearsall alone in a holding cell. T. 22. Baez was separately transported.

T.22.

At 3:20 a.m., while Pearsall remained alone in his holding cell, Cpl. Kuntzi interviewed with

Baez for approximately 15 minutes. T.26-27. She advised that she met up with Pearsall that evening

shortly before the police contact ; that they were walking in Capital Green; that at one point he gave

her the handgun to hold for him; and that as police cars were driving around she and Pearsall sat

down on the concrete step where they were arrested. T.27-28.

At approximately 4:00 a.m., Cpl. Kuntzi went to Pearsall's holding cell where he had been

passed out/sleeping the entire night. T.29; Gov. Ex. 1. Cpl. Kuntzi had not handled the referenced

pistol that night. T.22. Pearsall had not yet been fingerprinted. T.31. After putting on latex gloves,

Cpl. Kuntzi sampled both of Pearsall's hands, using a Binary Gunshot Residue Test Kit. T.29. As

Cpl. Kover read the kit's instructions, Cpl. Kuntzi took three samples, changing into a new pair of

latex gloves immediately before performing each sampling. T.29, 33-34. The first sample utilized

a simple cloth swab. T.34. Cpl. Kuntzi then took separate samples from Pearsall's hands. This part

3

of the test kit utilized two separate adhesive surfaces, both protected by replaceable covers. T.33-34.

The sample kit was maintained by Dover P.D. before being given to SA David DeBetta, ATF, who, in turn, mailed the samples to the RJ Lee Group, Inc., for testing. Alfred J. Schwoeble is that lab's Director. T.103.

## B.    The Science

The Government's GSR expert, Alfred J. Schwoeble, Director of the Forensic Science Department at the RJ Lee Group, testified at the *Daubert* hearing. T.83-103. Mr. Schwoeble has qualified as an expert and testified in over 127 trials in 19 states, the District of Columbia, and also in the U.S. and British Virgin Islands.[3]  T.85-86.  Mr. Schwoeble's testimony has never been excluded or even limited by any court, with the sole exception of the Minnesota state case of *Moua*. T.85.  In the instant case, the first laboratory examination performed by Mr. Schwoeble was conducted on the samples labeled by Cpl. Kuntzi as being taken from Pearsall's hands.  Mr. Schwoeble's report is part of the record, as it was an attachment to the defendant's proposed findings of fact and conclusions of law D.I. 18.  In his report, Mr. Schwoeble explained that gunshot residue originates in part from the firearm, the cartridge case, and the bullet, with most of the organic residue resulting from the primer.  When a semi-automatic handgun is fired, gases escape not only from the barrel but also from the slide the other rear portions of the handgun that are not air-tight.  The expelled gas contains microscopic particles of lead (Pb), antimony (Sb), and barium (Ba).  Particles "unique" to GSR and not otherwise found in nature are created when the high temperature caused

---

[3] A Westlaw search for the name "Schwoeble" demonstrates that he has testified extensively as an expert in gunshot residue evidence. *Commonwealth v. Reid*, 811 A.2d 530, 542 (Supreme Court of Pennsylvania 2002); *State v. Taylor*, 781 So. 2d 1205 (Supreme Court of Louisiana 2001); *State v. Gilcreast*, 2003 WL23094872 (Court of Appeals of Ohio 2003); *State v. Brister*, 2005 WL1005278 (Court of Appeals of Ohio 2005); *State v. Brashears*, 902 So. 2d 536 (Court of Appeals of Louisiana 2005).

by a firearm discharge fuses these three particles of lead, antimony and barium into a single spherical shape. Spherical particles containing only two of the three referenced elements are deemed "consistent-with" GSR. A particle consisting of only one of the three referenced elements is identified as a single component particle.

On the two samples labeled by Cpl. Kuntzi as being taken from Pearsall's hand, Mr. Schwoeble found a total of one particle "unique" to GSR, four "consistent-with" particles, and 14 single component particles. In his final report, Mr. Schwoeble wrote:

> Particles confirmed as being unique to or consistent with GSR could have resulted from [1] the discharge of a firearm, [2] being in close proximity to a discharging firearm or [3] from contact with a surface contaminated with GSR.

On March 2, 2007, Mr. Schwoeble submitted his second report, which concerned his examination of the handgun for GSR. Gov. Ex. 4; T.87. Mr. Schwoeble personally took two samples from the handgun. In performing his examination with a scanning electron microscope, Mr. Schwoeble programmed his equipment to "time out" or discontinue the examination after a certain number of identifiable particles were detected. T.87. An examination of the first sample resulted in the identification of greater than 24 "unique" particles and approximately 70 particles which were either "consistent with" or single component particles. The second sample produced greater than 23 unique particles with approximately 200 "consistent with" or single component particles. Gov. Ex. 4.

In his direct examination Mr. Schwoeble adopted his reports and agreed with the findings of the FBI's Symposium Report on GSR. On cross-examination Mr. Schwoeble was asked if he was aware that police stations, police automobiles, police handcuffs, and police holding rooms were typical environments that come into contact with gunshot residue. Mr. Schwoeble responded

5

affirmative but explained, "I would have to say the tests so far that have been done find that there

are very few three component particles found under any of those conditions." T.100. On re-direct

examination Mr. Schwoeble indicated that in the referenced police environments it would be equally

likely that incidental contact could cause GSR to be removed from a person's hands. T.101-102.

At the evidentiary hearing, Pearsall presented the testimony of John Kilty. Mr. Kilty's relevant

direct examination is summarized, as follows:

> [B]ased on the time differential between the shooting -- alleged shooting of
> a number of shots and the various activities that transpired between the time
> Mr. Pearsall was arrested and the time that he was actually sampled, that the
> finding of one particle is a problem for me and I simply don't have any
> confidence that that single particle of unique gunshot residue found on an
> adhesive lift from his left hand can be associated in any way with the event
> that is allegedly under investigation, that is, a shooting in a housing complex.

T. 112 (emphasis added).

Defense counsel summarized Mr. Kilty's direct examination, as follows:

> Q: So your opinion is based upon all the facts here that a finding of one
> gunshot particle is not enough of a threshold level to believe that Mr. Pearsall
> could have shot a gun or could have been close to a gun as it was discharged;
> is that correct?
>
> A: Certainly one particle is not enough for that, no, in my opinion.

T.115 (emphasis added).

On cross examination, Mr. Kilty explained that he retired from the FBI in 1987. T.117 Since

the early 1990s he has testified as a defense witness in approximately 20 trials, but only in one

pretrial hearing, in *Moua*, a Minnesota state case. T.119, 136.

Mr. Kilty testified that he was in agreement with Mr. Schwoeble's laboratory findings. T.121-

122. However, Mr. Kilty testified, "I quarrel with the relevance of finding a single particle." T.122

Mr. Kilty's relevant cross-examination is summarized, as follows:

6

I do not believe that the finding of a single particle in this case <u>or any other</u> <u>case</u> -- I have no confidence that I can associate that single particle back <u>to</u> <u>the shot or shots in question. . . .</u>" T. 129 (emphasis added).

\*    \*    \*

For the police officer who wants to know, or the detective who wants to know, did the guy I arrest <u>shoot a gun</u>? And want to use scientific evidence to demonstrate that, I do not believe that the finding of a single particle in this case or any other case -- I have no confidence that I can associate that single particle back to the <u>shot or shots</u> in question. T.128-29 (emphasis added)

Mr. Kilty further testified that a forensic scientist should consider the totality of circumstances in rendering an opinion. T.131. The prosecutor asked Mr. Kilty:

Q: Did you consider in the totality of circumstances in making your forensic determination and testifying today, did you take into account that Anna Baez said she got the gun from [Pearsall]?

A. Yes. I took into the totality that there was an accusation that this man fired a gun several times.

T.133.

The prosecutor then referenced the information provided by the anonymous caller:

Q: Is that the kind of thing that you consider in the totality of the circumstances in determining whether or not one particle is enough?

A: That's part of it. . . . T.134.

Pearsall also attached to his memorandum (D.I. 18) a SUMMARY OF THE FBI LABORATORY'S GUNSHOT RESIDUE SYMPOSIUM, MAY 31 - JUNE 3, 2005 (the FBI's GSR Summary). It explains that "[i]n early 2005 approximately 40 scientists representing local, state, federal, international, and private laboratories were invited to attend an FBI sponsored symposium

dedicated to topics relevant to the detection and significance of GSR analyses."[4] The FBI's GSR

Summary included the following note:

> The FBI Laboratory continues to believe that the GSR examination is valuable but has decided to use the resources previously dedicated to GSR in areas directly related to fighting terrorism, which is the FBI's primary mission.

Editor's Note, p. 14.

Important aspects of the FBI's GSR Summary are quoted below:

> With respect to the significance of the results obtained, most experts felt that even one PbBaSb spheroid particle is enough for a "positive" result. However, almost all of the attending experts agreed that GSR particles alone cannot be attributed to a particular shooting event. It also cannot be determined what exactly occurred with respect to a shooter's hands between the time of the shooting and sampling.

> \* \* \*

> A majority of the attendees reiterated throughout these discussions that a qualifying statement is needed in reports. The following example is considered an appropriate qualifying statement to use when particles are found on a person's hands: the findings are "consistent with that person's having fired a weapon, having been in the vicinity of a fired weapon, or having touched an item with gunshot residue on it."

> \* \* \*

> Many of the responding attendees agreed that it is good practice to compare residue found on the suspect to the shooting event through examination of the firearm, spent ammunition from the scene, or the victims' clothing; however, it is not essential to do so.

Significance and Report Writing, p. 11-12.

> \* \* \*

> All participants agreed that GSR sampling should be done at the scene where permissible. . . . Almost all participants agreed that if the subjects hands could not be sampled before placing the subject in a police vehicle, the

---

[4] Alfred J. Schwoeble, representing the RJ Lee Group Lab, was a symposium participant and expressly recognized in the FBI's GSR Summary for his contributions. Summary at p. 10.

subject's hands should be bagged in order to prevent possible contamination.

\* \* \*

The majority further agreed that it is possible for a handcuffed person's hands to be contaminated by the prior presence of GSR in the backseat of a police vehicle. However, if asked in court how likely it is for a handcuffed person's hands to be contaminated in the backseat of a police vehicle, most GSR experts would answer, "I don't know."

\* \* \*

It is widely agreed that the average person who is not exposed to firearms or ammunition or its components will not be found to have GSR particles on the hands.

Hands Sampling and Contamination, p. 4-6.

Before discussing acceptance criteria, the participants agreed that the most probative value of GSR examination occurs in a case where the subject claims to have not handled or fired a firearm.

Case Acceptance Criteria, p. 7.

## II.    **The Law**

### A.    **The Arrest Was Lawful**

Cpl. Kuntzi's arrest of Pearsall was lawful because there existed probable cause to believe that minutes before the police encounter at 459 New Castle Avenue he was in physical possession of the handgun, and further that during the actual police encounter he was in constructive possession of the handgun.[5]

---

[5] At the time of Pearsall's arrest, there existed objective facts from which Cpl. Kuntzi could reasonably conclude that Pearsall was a person prohibited from possessing a firearm. Five days before the arrest in question, Cpl. Kuntzi arrested Pearsall on an outstanding warrant issued by the Superior Court for the State of Delaware, a court of felony jurisdiction, for a violation of probation. Accordingly, at the time of Pearsall's second arrest, there existed objective facts to support the belief that Pearsall was prohibited from possessing a firearm due to his status as both a felon and a probationer. (Firearm prohibition is a standard condition of probation.)

Additionally, officers observed Baez possess the handgun in violation of 11 Del. C. 1442, carrying a concealed deadly weapon. Cpl. Kuntzi had probable cause to believe Pearsall also was

(continued...)

9

The determination of probable cause is addressed in *United States v. Stubbs*, 281 F.3d 109 (3d Cir. 2002), as follows:

> Police have probable cause to arrest if the circumstances are sufficient to cause a prudent person to believe that a crime has been committed and the person to be arrest committed it. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000). Probable cause is determined by the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983); *Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997). We must assess the "knowledge and information which the officers possessed at the time of arrest, coupled with the factual occurrences immediately precipitating the arrest" in determining if probable cause existed. *United States v. Harris*, 482 F.2d 1115, 1117 (3d Cir. 1973). "[P]robable cause is a fluid concept - turning on the assessment of probabilities in particular factual contexts - not readily, or even usefully, reduced to a neat set of legal rules." *Paff*, 204 F.3d at 436, *quoting Gates*, 462 U.S. at 232.

*Id*. at 122 (citations partially omitted).

The Third Circuit's opinion in *United States v. Robertson*, 305 F.3d 164 (3d Cir. 2002), interpreting the Fourth Amendment as it relates to investigative detentions provides additional guidance:

> As in all difficult suppression cases, we must consider the totality of the circumstances, including the police officer's knowledge, experience and common sense judgments about human behavior.

> \*   \*   \*

> To determine whether reasonable suspicion exists, we must consider the " 'totality of the circumstances - the whole picture.' " *United States v. Sokolow*, 490 U.S. 1, 8 (1989) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)); *see also United States v. Arvizu*, 534 U.S. 266 (2002) ("This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." (quotation and citation omitted). In *United States v. Nelson*, 284 F.3d 472 (3d Cir. 2002), we described *Arvizu* as follows: "In the Supreme

---

[5](...continued)

in violation of carrying a concealed deadly weapon by virtue of aiding and abetting liability, 18 U.S.C. § 2, and also co-conspirator liability.

> Court's most recent pronouncement on the Fourth Amendment reasonable suspicion standard, it accorded great deference to the officer's knowledge of the nature and the nuances of the type of criminal activity that he had observed in his experience, almost to the point of permitting it to be the focal point of the analysis." *Id.* at 482.
>
> Moreover, we are appropriately reluctant to "second-guess" investigative decisions made by officers in hot pursuit of criminal suspects. . . . The Supreme Court has held "the determination of reasonable suspicion must be made on common sense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125.

*Id.* at 167 (citations partially omitted).

An informant's tip can significantly contribute to probable cause for an arrest. *See United States v. Roberson*, 90 F.3d 75, 77 (3d Cir. 1996). In *Illinois v. Gates*, 462 U.S. 213, 233 (1983), the Supreme Court adopted the totality of the circumstances approach for evaluating an anonymous tip.

In the instant case, the anonymous tip was corroborated by the observations of the police officers. They were justified in the belief that the caller witnessed firsthand the events she reported and that she did so virtually contemporaneous with her observations. The caller correctly identified Pearsall by both first and last name, accurately described what he was wearing, and was specific that he had fired "five" shots into the air. Two to three minutes later the called explained that Pearsall passed off his gun to a woman and accurately described Baez's clothing. The caller's obvious familiarity with the address "459 New Castle Avenue" is further support that the caller was a local resident watching Pearsall on the night in question.

In response to the caller's first telephone call to the Dover Police Department, multiple police cars were dispatched to the area and searched it for Pearsall before the caller made the second report. It was reasonable for the police officers to infer that Pearsall became aware of their presence before

11

they located him, giving him a timely opportunity to pass the gun off to Baez. Additionally, Cpl. Kuntzi approached Pearsall on the night in question with reason to believe that Pearsall was acting disorderly in that neighborhood. Five days earlier, Cpl. Kuntzi had arrested Pearsall in the same area for disorderly conduct. Pearsall obviously had a history of such disorderly behavior in that area, as he was banned from it. On the night in questions he was drunk.

Finally, in considering the totality of the circumstances, the Court should give particular consideration to the manner in which Pearsall and Baez were dressed and its impact on the officers. The arrest photographs of Pearsall depict him in a relatively baggy t-shirt. He reasonably could have carried the gun concealed in the waistband of his shorts. However, Baez, a rather petite woman, wore cotton shorts and a sleeveless t-shirt, providing her no opportunity to conceal anywhere on her person the 9mm, semi-automatic pistol. Her awareness of that fact was obvious in her repeated refusal to stand at Officer Baumgarner's demand. When she did stand on the officer's third demand, she had to grab at her waistband to keep the gun from slipping or falling. Baez's inability to conceal the handgun or to even carry one in her waistband was recognized by Cpl. Kuntzi. He testified:

> [A]t the time we contacted her it was in her waistband. She had a pair of shorts that were loosely fitting and she couldn't walk around with that gun in her waistband, there was just no way she could do that.

T.81.

In summary, the anonymous tip was completely corroborated at the moment the police took the gun from Baez. The nature of her clothing made ridiculous her attempt to conceal, or even stand with, the gun. It was obvious to the officers that very shortly before their arrival Pearsall became aware of a police presence in the area and had given his gun to Baez to temporarily hold for him.

12

It was no less obvious to the police that Pearsall was in constructive possession of the firearm than if he were on the steps alone and the pistol was found by the police in a bush next to the steps.

Assuming *arguendo* that probable cause for Pearsall's arrest did not exist at 1:50 a.m. at New Castle Avenue, probable cause did exist at 3:20 a.m. at the Dover P.D. Headquarters when Baez made her statement incriminating Pearsall. It was only afterwards that Pearsall's hands were sampled for GSR by the officers. Thus, the taint of any bad arrest was purged before any evidence was collected from Pearsall.

In *United States v. Simpson*, 439 F.3d 490 (8th Cir. 2006), police officers gave chase to Simpson after mistaking him for a different person who was a known fugitive. During the chase the police came to realize their mistake but continued their pursuit because Simpson persisted in his flight. Shortly after Simpson's arrest and his proper identification, police discovered an outstanding arrest warrant for Simpson. Thereafter, police recovered three bullets from Simpson's person and he gave the police an incriminating statement. The district court found Simpson's initial arrest was not supported by probable cause. However, the district court did not suppress Simpson's three bullets and statement, finding that the unlawful arrest had become attenuated by the intervening circumstance of the outstanding arrest warrant so as to remove the taint imposed upon that evidence by the original illegality. *Simpson* at 495.

Affirming the district court, the Eighth Circuit cited factors for consideration:

> When determining if sufficient attenuation exists, one must focus on three specific factors: (1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975).

13

Where, as in the instant case, the intervening circumstance is not a voluntary act of the arrestee, such as a confession, "appropriate analysis must consider the nature of the intervening circumstance and the purpose and flagrancy of the official misconduct." *Id.* at 495.

The intervening circumstance, Baez's post-arrest statement, was given when Pearsall was sleeping/ passed out alone in his cell. The Dover Police Department did not exploit Pearsall's detention in any way to obtain Baez's statement.

As to the third factor, the *Simpson* court wrote:

> The final issue is whether Officers ... acted purposefully and flagrantly to violate ... Fourth Amendment rights. The purpose and flagrancy of the official misconduct is considered the most important factor because it is directly tied to the exclusionary rule - deterring police misconduct. Application of the exclusionary rule, however, does not serve this deterrent function when the police action, although erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights.
>
> Courts have found purposeful and flagrant conduct where: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up.

*Id.* at 496 (quotation marks and citations omitted).

If Cpl. Kuntzi's arrest at 1:50 a.m. at 459 New Castle Avenue was unlawful, that misconduct was neither obvious nor investigative in design. Cpl. Kuntzi consistently testified that he arrested Pearsall for the handgun that he had given to Baez to hold. The officer's good faith belief in the legality of his arrest was emphasized by his testimony that on the night in question he believed

14

Pearsall was trespassing.[6]  Thus, in the instant case there is no police misconduct to deter.  The exclusionary rule should not be applied.

**B.    The Government's Gunshot Residue Evidence Is Admissible**

The defendant confuses the application of *Daubert* to Mr. Schwoeble's testimony.  The Third Circuit's recent decision in *United States v. Ford*, 05-4998, 3d Cir. March 29, 2007, provides relevant guidance.

In *Ford*, a bank robber left a shoe print on a teller's counter.  After a *Daubert* hearing, the district court admitted the testimony of the Government's shoe print expert who testified that the referenced shoe print was "similar" to the type of imprint made by the shoe Ford was wearing when arrested.  In *Ford*, the Third Circuit distinguished between the two types of science addressed in *Daubert* cases:

> We note the distinction between the forensic identification sciences and the type of science typically at issue in *Daubert* cases.  Expert testimony based on empirical science "does things like determining what substance something is (e.g., what is that white powder?) or measuring the quantity of something (e.g., how much alcohol is in the murder victim's blood?)."  Michael J. Saks, *Banishing Ipse Dixit: The Impact of* Kumho Tire *on Forensic Identification Science*, 57 Wash. & Lee L. Rev. 879, 881 (2000).  Forensic identification science has a different objective.  Forensic identification evidence serves to "connect a crime scene object or mark to the one and only source of that object or mark."

*Ford* at 8 (footnote omitted).

---

[6] On the night in question, Cpl. Kuntzi was dispatched to Capital Green, from which Pearsall was banned and where the officer had arrested him five days earlier for trespassing.  After being dispatched to Capital Green, Cpl. Kuntzi arrested Pearsall in Senate View.  Capital Green and Senate View are adjacent public housing projects, however, one is State owned and the other is owned by the City of Dover.  This distinction was not understood by Cpl. Kuntzi on the night of Pearsall's arrest.  Cpl. Kuntzi testified at the hearing that on the night in question he believed Pearsall was trespassing.

In the instant case, Mr. Schwoeble's testimony is based solely on empirical science. Similar to a DEA chemist who uses a gas chromatagraph to identify a controlled substance, Mr. Schwoeble uses an electron microscope to identify GSR. Like the DEA chemist, Mr. Schwoeble has no interest in where, when, how, and by whom the examined evidence was collected. These experts simply identify the substance in question and report their findings. It is in the context of empirical science that *Daubert* must be applied to the instant case.

"The two fundamental requirements of *Daubert* are (1) reliable and (2) relevance. 509 U.S. at 590-91." *Ford* at 6.

### Reliability

The defendant does not challenge the reliability of the GSR identifications made by the Government expert. His qualifications, equipment, and lab methods all are accepted as legitimate. Pearsall's quarrel is not with Mr. Schwoeble's empirical science testimony, instead Pearsall challenges its relevancy.

### Relevance

The *Ford* court addressed the applicable relevancy standard:

> The second requirement should be evaluated under the standard expressed in Rule 401. *See, e.g., United States v. Prince-Oyibo*, 320 F.3d 494, 504 (4th Cir. 2003) ("What Rule 702 does require ... is that the district court make initial determinations that the proffered evidence possesses sufficient evidentiary reliability to be admissible as scientific, technical, or other specialized knowledge and that the proffered evidence is relevant in the sense that it will assist the trier of fact to understand the evidence or to determine a fact in issue." (emphasis added)); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) ("In fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant. . . .").

\* \* \*

16

> As the Supreme Court explained, "Rule 702 further requires that the evidence
> or testimony 'assist the trier of fact to understand the evidence or to
> determine a fact in issue.' This condition goes primarily to relevance."
> *Daubert*, 509 U.S. at 591. . . . This Court has previously expressed the view
> that "the standard for this [relevancy] factor 'is not that high.' " *Lauria v.
> Nat'l R.R. Passenger Corp.*, 145 F.3d 593, 600 (3d Cir. 1998) (quoting *In re
> Paoli R.R. Yard PCB Litigation*. 35 F.3d 717, 745 (3d Cir. 1994)).

*Id*. at 6, 10-11 (footnote omitted).

In the instant case, Pearsall fundamentally confuses the fact in issue. He is charged with

possessing, not shooting, a firearm. Many particles unique to and consistent with GSR were found

on the handgun; one particle unique to and multiple particles consistent with GSR were found on

the samples taken from Pearsall's hands. The relevance of the Government's GSR evidence exists

in the reasonable inference that Pearsall's hands became contaminated with GSR related particles

when he handled the 9mm, semi-automatic pistol.

The defense limits the issue in the case to whether a single unique particle of GSR is relevant

evidence from which to conclude that Pearsall shot a gun or was near a gun when it was shot. Mr.

Kilty testified about "the event that is allegedly under investigation, that is, a shooting in a housing

complex." T.112. A shooting is not the fact in issue. This disconnect is emphasized by defense

counsel's summary of Mr. Kilty's testimony:

> Q: So your opinion is based upon all the facts here that a finding of one
> gunshot particle is not enough of a threshold level to believe that Mr. Pearsall
> could have <u>shot a gun</u> or could have been close to a gun <u>as it was discharged;</u>
> is that correct?
>
> A: Certainly one particle is not enough for that, no, in my opinion.

T.115 (emphasis added).

Moreover, in challenging the admissibility of the Government's GSR evidence, Mr. Kilty does

not restrict himself to empirical science, he admits to considering the statements of Baez and the

17

anonymous caller. In doing so, he leaves the parties to speculate as to his assessments regarding the

credibility of witnesses. Despite Baez's post-arrest statement incriminating Pearsall, Mr. Kilty

testified on cross-examination: "There is no evidence that the gun was in this man's hands." T.132.

In his challenge to the admissibility of the Government's evidence, Pearsall should not be permitted

to use Mr. Kilty to usurp the function of the jury to weigh the credibility of witnesses.

The United States does not suggest that Mr. Kilty is not a proper trial witness. However, his

testimony goes to the weight, not the admissibility, of the Government's GSR evidence.

In *United States v. Paloscio*, 2002 WL 1585835 (S.D.N.Y. 2002), the district court denied a

pretrial motion to exclude evidence of gunshot residue, writing:

> The results of the testing, which was done through scientifically based
> techniques for identifying GSR, are admissible under the requirements set
> forth in Fed. R. Evid. 702, and in *Daubert v. Merrill Dow Pharms., Inc.* 509
> U.S. 589 (1993)., and *Kumho Tire Co. v. Carmichael*, 529 U.S. (1999), and
> their progeny. Defendant has advanced several challenges to the application
> of those techniques in the present case: such challenges, in the Court's
> estimation, go to the weight of the expert testimony, but do not render it
> inadmissible.

*Id* at 1-2.

In *United States v. Bonugli,* 162 Fed. Appx. 326 (5th Cir 2006), the 5th Circuit similarly

responded to an issue of possible GSR contamination: "Bonugli's contentions...that the gunshot

residue particles likely came from the hands of the officers who handcuffed him go to the weight of

the evidence rather than its admissibility."

The defendant's various arguments are addressed as follows:

(1)    Three alternate explanations for the GSR's source

The opinion of the government's expert complies with the qualification statement concerning

particles found on a person's hands, as set forth in the FBI's GSR Summary:

> A majority of the attendees reiterated throughout these discussions that a qualifying statement is needed in reports. The following example is considered an appropriate qualifying statement to use when particles are found on a person's hands: the findings are "consistent with that person's having fired a weapon, having been in the vicinity of a fired weapon, or having touched an item with gunshot residue on it."

Thus, the alternate explanations are appropriate.

(2) A single unique particle

The FBI's GSR Summary expressly provides that "even one [unique] particle is enough for a 'positive' result." Even the defendant's expert does not believe in a particular threshold. He believes that "the quantity...of the particles usually have *no bearing* on the circumstances of the incident." Defendant's Memo. p. 6; D.I. 18.

(3) The Dover PD evidence collecting methods.

The defendant contends that his hands could have become contaminated with GSR after his arrest. In this regard, Pearsall and Baez were transported to Dover PD Headquarters in separate vehicles and placed in separate holding cells. Pearsall's potential contact with surfaces within the holding cell was minimized by the fact that he was sleeping/passed out when his hands were sampled. Prior to taking the samples, Cpl. Kuntzi did not handle the pistol in question and used three separate pair of new latex gloves during the sampling.

Pearsall can only speculate as to whether GSR migrated to his hands from the police officers' handcuffs or squad car. It is as likely that while Pearsall was handcuffed and placed in the patrol car GSR was removed from his hands.

The United States cannot guarantee that the defendant's hands were not contaminated with GSR after his arrest. Similarly, the United States also cannot guarantee that the defendant was not contaminated with GSR upon his trespassing arrest several days earlier by Officer Kuntzi.

19

*Daubert* does not serve to render scientific evidence inadmissible when there is no guarantee against contamination. By way of example, when a suspect's DNA is found on a handgun there is no guarantee that the suspect handled the gun. The suspect could have sneezed or coughed on the gun. The suspect's DNA could have been transferred by his discarded clothing in the hands of a third party, or by a third party who had touched the suspect or handled the suspect's possessions. Any possibility of contamination of the defendant's hands with GSR after his initial encounter with police is a matter which goes to the weight of the evidence, not its admissibility. See *Palascio* and *Bonugli*.

The Minnesota case of *State v. Jason Moua*, Court File No. K5-05-7335 (Anoka County Court, July 7, 2006), is distinguishable from the instant matter by both the expert's opinion and the police evidence gathering methods.

In *Moua*, Alfred J. Schwoeble's opinion, as written in his report, was not what he intended. His report indicated, in summary, that the relevant GSR was the result of shooting a gun, being in close proximity to a fired gun, or touching A GUN OR AMMUNITION. Mr. Schwoeble testified that he meant the report to read - or touching A SURFACE CONTAMINATED WITH GSR. *Moua* at 10. Such a surface could include, but is not limited to, a gun. The court in *Moua* erroneously rendered its opinion exclusively based on Mr. Schwoeble's written opinion, not his opinion as corrected by his testimony. The police sampling methods also are to distinguished.

In *Moua*, before that defendant's hands were sampled, he had been in a car with persons who admitted to having fired a gun or being in close proximity to a fired gun. The defendant was handcuffed together with 8 other suspects, whose hands were observed to be touching, and upon being ordered to wash his hands was observed scrubbing his hands and arms up to his elbows.

Additionally, all suspects were sampled at the same table which was not properly cleaned between suspects. These conditions do not exist in the instant mater.

The United States respectfully submits that *Moua* was incorrectly decided. That court disregarded that Mr. Schwoeble corrected his written opinion, which is in conformity with the FBI's GSR Summary. While the Minnesota police officers did not maximize the potential against contamination, that issue concerns the weight, not the admissibility, of the evidence.

    (4)   <u>Rule 403</u>

Finally, the probative value of the Government's GSR evidence is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. At trial the defendant can be expected to strenuously challenge Baez's credibility. Accordingly, the evidence is neither cumulative nor unnecessary. The historical acceptance of GSR testimony in Federal and State courts is evidence that the subject matter is not confusing and misleading to a jury.[7] The defendant can demonstrate no unfair prejudice, as the Government's evidence comports with the findings set forth in the FBI's GSR Summary.

The possibility of contamination does not render meaningless the opinions of the government's expert. In *United States v. Graves*, 2006 WL3734367 (E.D. Pa. 2006), the court admitted the government's DNA evidence over objection. The Court wrote:

---

[7] The Supreme Court of Louisiana has observed, "Gunshot residue detection is not a new science. This Court has recognized experts in this field since 1981." *State v. Robinson*, 874 So.2d 66 (2004). This science also is well recognized and received into evidence by federal courts without the necessity of *Daubert* hearings. *United States v. Caldwell*, 182 F.Ed. Appx. 227 (4th Cir. 2006); *United States v. Simpson*, 2007 WL163053 (4th Cir. 2007); *Herrera v. Lamaster*, 149 Fed. Appx. 791 (10th Cir. 2005); *Bell v. Bell*, 460 F.3d 739 (6th Cir. 2006).

> Although the Third Circuit has not addressed directly the admissibility of DNA evidence of low statistical significance under Rule 403, it has stated that "overtly probabilistic evidence is no less probative of legally material facts and other types of evidence." *Hannigan*, 27 F.3d at 893.

In *Ford*, that defendant objected to the expert's opinion because he could conclude only that the shoe impressions were "similar." The Third Circuit rejected that challenge, ruling as follows:

> Ford invites us to [rule] that *any* opinion that is even the slightest bit lukewarm fails to meet the requirements for admissibility. An expert opinion that expresses a possibility that a crimes scene impression may have been made by shoes worn by the defendant and otherwise comports with the *Daubert* analysis, is clearly relevant to the question of whether the defendant was present at the scene of the crime.

*Id.* at 14 (footnote omitted).

Similarly, the Government's GSR evidence is clearly relevant to the question of whether Pearsall was in possession of the 9mm, semi-automatic pistol.

In conclusion, the Court should dismiss Pearsall's motions.

COLM F. CONNOLLY
United States Attorney

By:

Edmond Falgowski
Assistant United States Attorney

Dated: 4 - 13 - 07

22

## CERTIFICATE OF SERVICE

UNITED STATES OF AMERICA    )
                                     )
           v.                       )         Criminal Action No. 06-118-JJF
                                       )
KEVIN L. PEARSALL            )

I, Sharon Bernardo, an employee of the United States Attorney's Office, hereby certify that on April 13, 2007, I electronically filed the foregoing:

### MOTION AND ORDER TO DISMISS

with the Clerk of the Court using the CM/ECF which will send notification of such filing to:

> Christopher Koyste, Esquire
> Federal Public Defender's Office
> First Federal Plaza, Suite 110
> 704 King Street
> Wilmington, DE   19801
> ecf_ck@msn.com