IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| v. | : | Criminal Action No. 06-118-JJF |
| KEVIN L. PEARSALL, | : | |
| Defendant. | : | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE OBTAINED FROM ILLEGAL SEIZURE**

Defendant, Kevin Pearsall ("Mr. Pearsall"), by and through his undersigned counsel, Christopher S. Koyste, respectfully submits this Memorandum of Law in support of his Motion To Suppress Evidence Obtained From Illegal Seizure. For the reasons set forth below, Mr. Pearsall seeks to exclude the Government's admission, at trial, of any and all evidence that was obtained by police officers as the result of his illegal seizure on August 5, 2006.

I.  **INTRODUCTION**

On October 24, 2006, Mr. Pearsall was indicted by the Grand Jury for the District of Delaware for being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). On January 17, 2007, Mr. Pearsall filed a Motion to Suppress Evidence Obtained From Illegal Seizure. The grounds for Mr. Pearsall's motion related to his arrest by the Wilmington Police Department on the basis of an uncorroborated anonymous tip.

On March 16, 2007, this Court conducted a hearing[1] to determine Mr. Pearsall's suppression motion. At the conclusion of the hearing, the Court instructed the Government to file a Memorandum regarding its position on the suppression issue, and for Mr. Pearsall to file the instant Memorandum in response thereto.

Mr. Pearsall contends that the anonymous tip in this case, which led to Mr. Pearsall's immediate arrest, lacked the indicia of reliability that would support an investigatory stop. See Florida v. J.L., 529 U.S. 266 (2000). Neither the anonymous tip nor the police officer's personal observations provided the level of reasonable suspicion necessary to justify an investigatory stop. Indeed, where the police officers immediately arrested Mr. Pearsall upon arrival at the scene, the officers effectuated an investigatory arrest that lacked probable cause. See Taylor v. Alabama, 457 U.S. 687 (1982). Therefore, the police seized Mr. Pearsall in violation of the Fourth Amendment, and any evidence obtained as result of this illegal seizure must be suppressed under the fruit of the poisonous tree doctrine, as expressed in Wong Sun v. United States, 371 U.S. 471 (1963) and its progeny.

---

[1] The Court also conducted a hearing pursuant to Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), to determine Mr. Pearsall's January 17, 2007 Motion to Request A Daubert Hearing.

## II.   FACTUAL BACKGROUND[2]

On August 5, 2006, the Dover Police Department received an anonymous telephone call[3] from an individual who alleged that she saw Mr. Pearsall fire a handgun several times before concealing it in his clothing. A few minutes later, the anonymous caller again contacted the police department, this time specifying Mr. Pearsall's location and stating that he had given the gun to a woman that was sitting next to him.

Police officers arrived at the scene and saw a woman and two men sitting together. Mr. Pearsall, who was one of the men, was immediately arrested, along with Anna Baez and Leslie Brown. The police officers searched Ms. Baez and found a 9mm semiautomatic pistol in her shorts.

The officers subsequently conducted gunshot residue ("GSR") testing on Mr. Pearsall's hands and sent three samples to the RJ Lee Group, Inc. for testing. The RJ Lee Group's laboratory analysis of Mr. Pearsall's left hand sample confirmed only one particle unique to GSR, and an analysis of Mr. Pearsall's right hand sample confirmed only one particle consistent with GSR. The Report further stated that there were no GSR particles found on the presumptive swab of Mr. Pearsall's right hand. The RJ Lee Group also performed an analysis of the subject firearm, and concluded that it contained numerous particles unique to, and consistent with, GSR.

---

[2] For the sake of brevity, Mr. Pearsall highlights key facts relevant to the suppression issue. Specifically, Mr. Pearsall will recount those portions of Officer Paul Kunzi's testimony that directly bears on the suppression issue. Mr. Pearsall, however, continues to rely on the facts as previously outlined in his April 9, 2007 Memorandum of Law in Support of Defendant's Motion to Request A Daubert Hearing.

[3] The Government has indicated that it does not know the anonymous caller's identity.

### III.  MARCH 16, 2007 MOTION HEARING

On March 16, 2007, this Court held a hearing on Mr. Pearsall's suppression motion. At the hearing, the Government presented two witnesses: (1) Officer Paul Kunzi, the arresting officer; and (2) Alford Schwoeble, Director of the RJ Lee Group's Forensic Science Department. Mr. Pearsall presented Sean Williams, an investigator for the Federal Public Defender's Office, and John Kilty, a forensic science consultant.

#### A. Officer Paul Kunzi's Testimony

Officer Paul Kunzi testified about the circumstances surrounding Mr. Pearsall's arrest and GSR testing. Officer Kunzi stated that he received two radio dispatches, which reported two anonymous phone calls. In the first call, the anonymous caller stated that Mr. Pearsall had fired shots and provided a clothing description. Tr. at 12-14. Two to three minutes later, Officer Kunzi received a second dispatch, which stated that the anonymous caller had called in for a second time. The anonymous caller reported that Mr. Pearsall was seated in front of 459 New Castle Avenue, and that he had passed the handgun to a female that was sitting next to him. Tr. at 14.

Officer Kunzi reported to the specified address and simultaneously arrived with Officers Muscemici and Bumgarner. Tr. at 17. Officer Kunzi testified that Officer Bumgarner was the first to approach Mr. Pearsall, Ms. Baez and Mr. Brown, and that he immediately recognized Mr. Pearsall because of a prior arrest. Tr. at 17. Officer Kunzi testified that Officer Bumgarner claimed to have observed a bulge in Ms. Baez's pants as he approached her, and that she refused to stand up at his request. When Ms. Baez finally stood, she grabbed her waistband, which prompted Officer Bumgarner to take Ms. Baez to a grassy area and into custody. Tr. at 20.

During Officer Bumgarner's exchange with Ms. Baez, Officer Kunzi arrested Mr. Pearsall, and Officer Muscemici arrested Mr. Brown. According to Officer Kunzi, although Officer Bumgarner recovered a Vector 9mm gun from Ms. Baez, he believed that the gun belonged to Mr. Pearsall because of the two anonymous phone calls. Tr. at 21. Officer Kunzi further stated that the basis for Mr. Pearsall's arrest was because of the "gun complaint and passing off the gun," and not, because he was trespassing.[4] Tr. At 71.

Officer Kunzi stated that he transported Mr. Pearsall to Dover Police Department Headquarters. Tr. at 22. Upon arriving at headquarters, Officer Kunzi testified that he placed Mr. Pearsall into a group holding facility, where he continued to remain in handcuffs. Tr. at 22.

Officer Kunzi also testified that he retrieved Ms. Baez from her holding cell and interviewed her for approximately 15 minutes. Tr. At 26-27. During the interview, Ms. Baez stated that Mr. Pearsall had given her the gun and asked her to hold it for him. Officer Kunzi did not test Ms. Baez's hands or clothing for gunshot residue. Tr. at 26-27.

## IV. **DISCUSSION**

In Terry v. Ohio, 392 U.S. 1, 30 (1968) and its progeny, the Supreme Court determined that the Fourth Amendment permits police officers to conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that "criminal activity is afoot." In "justifying the particular intrusion, the police officer must be able to point to specific and articulable facts which, taken

---

[4] During the hearing, Officer Kunzi revealed that Mr. Pearsall had been arrested on August 1, 2006 for trespassing at Capital Green Apartments. Although there was some confusion as to whether Officer Kunzi arrested Mr. Pearsall on August 5, 2006 because he was believed to be trespassing, Officer Kunzi made clear that the purpose of this arrest was because of the gun complaint from the anonymous caller. Tr. at 79.

together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21 (stating that this "demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence").

In Whiteley v. Warden, Wyoming State Penitentiary, 401 U.S. 560, 567 (1971), the Supreme Court stated that if the "initial impetus" for an arrest is an informer's tip, information gathered by the arresting officers can be used to sustain a finding of probable cause for an arrest that could not be supported by the tip alone, if additional information acquired by the arresting officers corroborates the informer's tip that the arrestee committed the felony or was in the process of committing the felony. In Illinois v. Gates, 462 U.S. 213, 328 (1983), the Court adopted a "totality of the circumstances" approach to determining whether an informant's tip establishes probable cause.

"Gates made clear, however, that . . . an informant's 'veracity,' 'reliability,' and 'basis of knowledge' [are] 'highly relevant in determining the value of his report." Id. (citations omitted). These factors are also relevant in the reasonable-suspicion context. Id.; see also Florida v. J.L., 529 U.S. 266 (2000) (stating that a tip lacked the standard indicia of reliability to support a legitimate stop where it simply provided an accurate description of a suspect's readily observable location and appearance).

In Alabama v. White, 496 U.S. 325, 326 (1990), the Court identified the problems inherent in police reliance on anonymous tips:

> [A]n anonymous tip seldom demonstrates the informant's basis of knowledge or veracity inasmuch as ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations and given that the veracity of persons supplying anonymous tips is 'by hypothesis largely unknown, and unknowable. This is not to say that an anonymous caller could never provide the reasonable suspicion necessary for a Terry stop . . . [T]he tip [here] provides virtually nothing from which one might conclude that [the caller] is either honest or his information reliable;

6

> likewise, the [tip] gives absolutely no indication of the basis for the [caller's] predictions regarding . . . criminal activities. By requiring 'something more' . . . we merely apply what we said in [Adams v. Williams, 407 U.S. 143 (1972): 'Some tips, completely lacking in indicia or reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized.

Id. at 329.

In United States v. Roberson, 90 F.3d 75, the Third Circuit addressed the necessity for corroboration of an anonymous informer's tip. In Roberson, an anonymous caller identified the defendant's physical description and stated that he was selling drugs at a specified location. The anonymous tip was relayed to the police, who saw a man meeting the defendant's description standing on a corner known to be a "hot area" for drug trafficking. The officers observed the defendant walk to a car that was facing the wrong way down a street, and lean in as if speaking with the vehicle's occupants. The officers, who observed no indicia of drug activity, approached the defendant and observed the butt of a gun protruding from his pants. The officers patted the defendant down and seized a gun and drugs.

The Third Circuit found that the anonymous informer's tip had no predictive value that could corroborate future events, and that the police had no basis for assessing the informant's reliability or the grounds in which the informant believed that a crime was being committed. The Court made clear that where the officers failed to corroborate readily observable facts and did not observe suspicious behavior, no reasonable suspicion existed to support an investigative stop. The Court also noted that the "police were not powerless to act on the non-predictive, anonymous tip," and could have "set up a surveillance of the defendant . . . to observe suspicious behavior." Id. at 81.

Similar to Roberson, in the instant case, the officers observed no suspicious behavior to corroborate the fleshless, anonymous tip that provided non-predictive information regarding Mr. Pearsall, his location and an allegation that he had given a gun to Ms. Baez. Instead of observing Mr. Pearsall to see if he was engaged in suspicious behavior, the officers immediately arrested him upon arrival at the scene, effectuating "an investigatory arrest without probable cause, based on an uncorroborated informant's tip." Taylor v. Alabama, 457 U.S. 687 (1982). The Supreme Court and Third Circuit have made clear that such lack of corroboration for an anonymous tip is insufficient to support an investigatory stop or probable cause for an arrest. See, e.g., J.L.; Alabama v. White; Roberson.

Mr. Pearsall notes that, although the Third Circuit expressly declined to decide the level of corroboration necessary when an anonymous caller reports a gun tip, corroboration was still necessary to support the tip. The anonymous caller made no suggestion that Mr. Pearsall posed an imminent danger. To the contrary, the caller stated that Mr. Pearsall was not in possession of the gun, that he had allegedly given it to Ms. Baez and that he was sitting on steps at a specified location. Mr. Pearsall submits that corroboration for the anonymous tip was still necessary because, surprisingly, the Wilmington Police Department did not receive any other calls reporting an alleged shooting or Mr. Pearsall's alleged activities in this area, and he did not attempt to evade the police or otherwise act suspiciously when the officers approached and immediately arrested him. See, e.g., Roberson, 90 F.3d at 76, 81 (noting that the arresting officers did not observe the butt of a gun in the defendant's pants until after they had improperly approached him). Mr. Pearsall and the co-defendants were simply sitting on the steps in front of his sister's home when the police arrived on the scene, and the arresting officer testified that the basis for the immediate arrest was the anonymous

8

caller's tips.

The Government attempts to argue that the "anonymous tip was completely corroborated at the moment the police took the gun from Ms. Baez." See Government's Memorandum In Support Of Its Proposed Findings of Fact and Conclusions of Law, at 12. The Government also asserts that, assuming no probable cause existed for Mr. Pearsall's arrest, probable cause existed when Ms. Baez gave her statement, and that "it was only afterwards that Pearsall's hands were sampled for GSR by the officers." Id. at 13. The Government's position is inconsistent with current Supreme Court and Third Circuit precedent regarding illegally seized evidence, relies on distinguishable, non-binding authority for this position and takes liberties with the officer's basis for testing Mr. Pearsall's hands for GSR.

In Wong Sun v. United States, 371 U.S. 471 (1963), the Supreme Court made clear that evidence seized during an illegal seizure must be excluded pursuant to the "fruit of the poisonous tree doctrine. In Wong Sun, the Court expressly rejected the notion that a search that is unlawful from its inception "could be validated by what it turns up." Id. at 484; see also Segura v. United States, 468 U.S. 796 (1984) (stating that evidence obtained as the direct result of an illegal search or seizure is plainly subject to exclusion).

The scope of the exclusionary rule is determined by "whether, granting establishment of the primary illegality, the evidence to which objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the original taint." United States v. Nash, No.CRIM.A. 02-054-SLR, 2002 WL 31500920, at *5 (D.Del. Nov. 6, 2002). In Nash, Chief Judge Robinson explained that "the Third Circuit has interpreted Wong Sun to involve two discrete inquiries: (1) the proximity of an initial illegal custodial act to the [acquired evidence];

9

and (2) the intervention of other circumstances subsequent to an illegal arrest which provide a cause so unrelated to that initial illegality that the acquired evidence may not reasonably be said to have been directly from, and thereby tainted by, that illegal arrest." Id. at *5.

In Nash, officers observed a Cadillac, which matched the description provided by a tipster, parked on a street. A police officer observed the Cadillac for five to ten minutes and saw a black male enter the front seat. As the vehicle began to move, police officers followed the car for one block. The vehicle stopped at a stop sign, and an unmarked police car pulled directly up to the bumper so that the two vehicles were facing each other. The police officers alleged that the defendant opened the door and fled the vehicle. Police officers chased the defendant, ordered him to stop several times and identified themselves as police officers. The officers managed to tackle the defendant, who was carrying a small plastic bag and holding a marijuana cigarette. The officers opened the defendant's bag without defendant's consent and discovered a gun.

The court determined that the Cadillac was seized when the police vehicle pulled directly in front of it and prevented it from moving, and that there was insufficient evidence to support the stop. Specifically, the court found that the tip was similar to the "fleshless tip in Florida v. J.L., criticized by the Supreme Court as lacking evidence of reliability and predictive information." Id. at *4. The court then concluded that the stop of the Cadillac and discovery of the gun were too closely connected, and that the defendant's subsequent flight was intimately related to the stop and would not have occurred but for the police conduct. Id.

Here, the proximity of the illegal arrest and the acquired evidence, including Ms. Baez's statements, are closely connected, and there is no intervening act subsequent to Mr. Pearsall's arrest to purge the taint of the illegal arrest. See e.g., United States v. Butts, 704 F.2d 701 (3d Cir. 1983)

(stating that the Government failed to carry its burden of proving that the taint of the defendant's illegal arrest was purged prior to the time of his confession; the Government did not suggest any meaningful event that occurred within the four hours between the illegal arrest and confession). The Government cannot allege any meaningful, intervening circumstances or acts because they simply do not exist.

Instead, the Government relies on a non-binding case that is factually distinguishable from the instant facts. In United States v. Simpson, 439 F.3d 490 (8th Cir. 2006), the Eighth Circuit determined that although the defendant was subject to an illegal initial seizure, the evidence, which was obtained after the police officers' discovery of an outstanding warrant, could not be excluded because there was "no chance that the police could have exploited an illegal arrest by creating a situation in which [the] criminal response is predictable." Id. at 495. In other words, the court focused on the fact that the "intervening circumstance [was] not a voluntary act by the defendant." Id.

The evidence and statements in this case were clearly obtained by an exploitation of the illegal arrest, and not by means sufficiently distinguishable to be purged of the original taint. Nash. Accordingly, this Court should exclude the firearm and forensic evidence based on Mr. Pearsall's illegal arrest.

### V.     **CONCLUSION**

The Court should exclude the firearm and forensic evidence because the evidence was obtained as the result of an illegal arrest. The officers relied on an uncorroborated anonymous tip to immediately arrest Mr. Pearsall, but did not independently observe any suspicious behavior to substantiate this tip. See e.g., Roberson, 90 F.3d at 75. Additionally, this evidence, which was obtained as the result of the illegal arrest, must be excluded pursuant to the fruit of the poisonous tree doctrine expressed in Wong Sun, 371 U.S. at 471.

Accordingly, this Court should exclude any and all evidence obtained as the result of Mr. Pearsall's illegal arrest.

      /s/ Christopher S. Koyste
Christopher S. Koyste, Esquire
Assistant Federal Public Defender

Tieffa N. Harper, Esquire
Research & Writing Attorney

Attorneys for Kevin Pearsall

FEDERAL PUBLIC DEFENDER'S OFFICE
704 King Street, Suite 110
Wilmington, Delaware  19801
(302) 573-6010
Email: ecf_de@msn.com

**CERTIFICATE OF SERVICE**

Undersigned counsel certifies that the attached filing of Defendant Pearsall is available for public viewing and downloading and was electronically delivered on April 20, 2007 to:

Edmond Falgowski, Esq.
Assistant United States Attorney
1007 Orange Street, Suite 700
Wilmington, Delaware 19801

 /s/ Christopher S. Koyste
Christopher S. Koyste, Esquire
Assistant Federal Public Defender

Tieffa N. Harper, Esquire
Research & Writing Attorney

Attorneys for Kevin Pearsall

FEDERAL PUBLIC DEFENDER'S OFFICE
704 King Street, Suite 110
Wilmington, Delaware 19801
(302) 573-6010
Email: ecf_de@msn.com