```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF DELAWARE
```

UNITED STATES OF AMERICA,          :
                                   :
        Plaintiff,                 :
                                   :
    v.                             :   Criminal Action No. 06-118-JJF
                                   :
KEVIN L. PEARSALL,                 :
                                   :
        Defendant.                 :

Colm F. Connolly, Esquire, United States Attorney, and Edmond Falgowski, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, DISTRICT OF DELAWARE, Wilmington, Delaware.
Attorney for Plaintiff.

Christopher S. Koyste, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, DISTRICT OF DELAWARE, Wilmington, Delaware.
Attorney for Defendant.

**MEMORANDUM OPINION**

June 22, 2007
Wilmington, Delaware

**Farnan, District Judge.**

Presently before the Court are the Motion To Request A Daubert Hearing (D.I. 14), the Motions To Suppress Evidence Obtained From An Illegal Seizure (D.I. 15, 24), and the Motion To Suppress Evidence Obtained From An Illegal Seizure filed by Defendant Kevin L. Pearsall. For the reasons set forth below, both motions have been denied.

## I.    BACKGROUND

On October 24, 2006, Mr. Pearsall was indicted by the Grand Jury for being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). On January 17, 2007, Mr. Pearsall moved for a Daubert hearing, pursuant to Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), requesting that the Court determine the reliability and relevance of the Government's proposed expert testimony. Mr. Pearsall also moved, pursuant to Federal Rule of Criminal Procedure 12(b)(3) and 41(f) and the Fourth Amendment of the United States Constitution, to suppress all evidence derived from Mr. Pearsall's arrest.

The Court held an evidentiary hearing for both motions on March 16, 2007, and post-hearing briefing was completed on April 20, 2007. At the hearing, the Government presented two witnesses: Dover Police Officer Paul Kunzite and Mr. Alfred Schwoeble, Director of the RJ Lee Group's Forensic Science Department. Mr. Pearsall also presented two witnesses: Mr. Sean

2

Williams, an investigator for the Federal Public Defender's Office, and Mr. John Kilty, a forensic science consultant. This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law regarding the instant motions.

## II. Parties' Contentions

Mr. Pearsall contends that, when he was arrested, there was no reason for Officers Kuntzi, Bumgarner and Muscemici to believe that he was involved in illegal activity. As a result, Defendant contends that his arrest was illegal, and therefore the results of the Binary Gun Shot Residue (GSR) test performed on him after his arrest, as well as on the handgun recovered during the arrest, should be suppressed. Mr. Pearsall also contends that the Government's expert reports and proposed expert testimony should be excluded on the grounds that they are not reliable, relevant or more probative than prejudicial.

The Government contends that the police had sufficient information to reasonably believe that Mr. Pearsall was engaged in illegal activity, and therefore they were justified in conducting an investigative stop. The Government further contends the discovery of a handgun during that stop, coupled with a fully corroborated phone tip, gave the police probable cause to arrest Mr. Pearsall and his companions. In the alternative, the Government contends that, even if probable cause did not exist at the time of the arrest, it did exist when one of

Mr. Pearsall's companions told the police that Mr. Pearsall handed her a gun. The Government further contends that because Mr. Pearsall's hands were not tested for GSR until after this information was provided to the police, the test results were not tainted. Finally, the Government contends that Mr. Schwoeble's expert report is reliable, relevant and highly probative and therefore meets the Daubert requirements for admissibility.

**III. FINDINGS OF FACT**

    A.   The Arrest and GSR Testing

On Saturday, April 5, 2006, at approximately 1:50 a.m., the Dover Police Department dispatcher received an anonymous telephone call. (Tr. 10, 16). The caller reported that "Kevin Pearsall" was in the area of Capital Green, a public housing project in Dover, Delaware, and had fired a handgun into the air five times. (Tr. 10-13, 16). The caller described "Kevin Pearsall" as wearing a white t-shirt and shorts. Id. The caller further reported that "Kevin Pearsall" had placed the handgun in the waistband of his shorts after shooting it. (Tr. 13).

The dispatcher relayed the caller's information by radio to Corporal Paul Kuntzi[1] and Patrolmen Bumgarner and Musemici. (Tr. 10, 15-16). The three officers each responded in separate vehicles. (Tr. 17). Upon arriving at the area described by the

---

[1] Corporal Kuntzie is a ten year veteran of the Dover Police Department and is assigned to the Patrol Unit.

caller, Corporal Kuntzi began looking for Mr. Pearsall, whom he had arrested earlier that week, also in Capital Green.[2] (Tr. 15, 23-24, 66).

Shortly thereafter, the same anonymous caller contacted the dispatcher again and reported that "Kevin Pearsall" had passed his handgun to a female who was described as wearing a white t-shirt and shorts. (Tr. 14). The caller stated that both "Kevin Pearsall" and the female were sitting next to one another on some steps in front of 459 New Castle Avenue.[3] Id. This new information was immediately relayed to Corporal Kuntzi and Patrolmen Bumgarner and Musemici. (Tr. 14). Corporal Kuntzi arrived at the referenced address approximately ten seconds after the radio dispatch. (Tr. 15, 17). Corporal Kuntzi found Mr. Pearsall sitting on the referenced steps and wearing the described clothing. (Tr. 35, Gov. Ex. 1). A woman, later identified as Anna Baez, was sitting immediately to Mr. Pearsall's left. (Tr. 18, 35, Gov. Ex. 1). The clothing Ms. Baez was wearing was consistent with the caller's report. Id. A third person, Mr. Leslie Brown was seated to Mr. Pearsall's right.

---

[2] It was during this arrest that Corporal Kuntzi learned that Mr. Pearsall had been banned from the Capital Green complex on March 3, 2000.

[3] The referenced steps are adjacent to the public sidewalk, and are approximately 10-15 feet from the front door of 459 New Castle Avenue.

Officer Bumgarner was the first officer to approach the steps, with Corporal Kuntzi following approximately 10-15 feet behind him. (Tr. 19). Corporal Kuntzi was scanning the area for the gun the caller had reported. Id. At the same time, Officer Bumgarner observed that Ms. Baez was concealing an object in the front of her shorts. (Tr. 20). After telling her multiple times to stand up, she finally complied. Id. However, as she stood, she grabbed at the object in the front of her shorts, prompting Officer Bumgarner to force her to the ground. (Tr. 20-21). At that point, Officer Bumgarner recovered an unloaded 9mm, semi-automatic pistol that had been tucked into the front waistband of her shorts. Id.

Seeing Officer Bumgarner take the handgun from Ms. Baez, Corporal Kuntzi then arrested Mr. Pearsall, concluding that the recovered handgun was the same gun the anonymous caller said Mr. Pearsall had fired into the air, placed in his waistband and later passed off to a female companion. (Tr. 18, 21). Corporal Kuntzi handcuffed Mr. Pearsall at the scene of the arrest. (Tr. 22). He then transported Mr. Pearsall in the backseat of a patrol car to police headquarters and placed him alone in a holding cell. Id. Corporal Kuntzi did not bag Mr. Pearsall's hands for transport. (Tr. 52) Ms. Baez was also arrested and transported to police headquarters in Officer Bumgarner's

vehicle. (Tr. 22). At headquarters, she was kept apart from Mr. Pearsall. Id.

At 3:20 a.m., Corporal Kuntzi interviewed Ms. Baez. The interview lasted approximately 15 minutes. (Tr. 26-27). Ms. Baez explained that she had met up with Mr. Pearsall that evening shortly before the police arrived, and they had been walking through Capital Green together when Mr. Pearsall gave her the handgun and asked her to hold it for him. Id. She further explained that when police cars appeared in the neighborhood, she and Mr. Pearsall sat down on the concrete steps in front of 459 New Castle Drive. Id. Despite the fact that the gun was recovered from Ms. Baez, Corporal Kuntzi did not test her hands or clothing for GSR. Id. Moreover, though aware that Ms. Baez had handled the gun earlier that night, Corporal Kuntzi touched the same surfaces as her, and was in close contact with her throughout the entire interview. (Tr. 57, 62). However, Corporal Kuntzi never handled the gun itself. (Tr. 22).

After speaking to Ms. Baez, Corporal Kuntzi went to Mr. Pearsall's holding cell around 4:00 a.m. to test him for GSR, using a Binary Gunshot Residue Test Kit. (Tr. 28-29). Corporal Kuntzi chose to conduct the GSR in the holding cell, rather than taking Mr. Pearsall to a more sterile environment. (Tr. 55). Though he did not wash his hands or arms before testing Mr. Pearsall for GSR, despite his earlier contact with potentially

7

contaminated surfaces, Corporal Kuntzi put on a new pair of latex gloves before starting the test. (Tr. 29, 55-56). Having never conducted a GSR test before, Corporal Kuntzi closely followed the kit's instructions. (Tr. 29, 55). He took three samples from Mr. Pearsall's hands, changing into a new pair of latex gloves immediately before performing each sampling. (Tr. 33-34). The first sample, a presumptive swab, utilized a simple cloth swab. (Tr. 34). The kit next required Corporal Kuntzi to take separate samples from each of Mr. Pearsall's hands, using a separate adhesive surface for each hand. Id. Each surface was protected by replaceable covers. Id. After he completed the sampling, the test kit was maintained by Dover Police Department before being given to Special Agent David DeBetta of the Bureau of Alcohol, Tobacco and Firearms, who then mailed the samples to the RJ Lee Group, Inc., a laboratory, for testing. (Tr. 103). RJ Lee Group, Inc. tested the swabs and Alfred J. Schwoeble, director of the lab, issued an expert report. Id.

  B. The Science Behind RJ Lee Group Inc.'s Expert Report

  Gunshot residue originates from the firearm, the cartridge case, and the bullet. (D.I. 18). Most of the organic residue results from the primer. When a semi-automatic handgun is fired, gases escape from non-air-tight portions of the gun. Id. The expelled gases contain microscopic particles of lead, antimony, and barium. Id. Particles that are "unique" to GSR, and not

otherwise found in nature, are created when the lead, antimony and barium particle fuse into a single spherical shape because of the high temperature caused during a firearm discharge. Id. Spherical particles containing only two of the three elements are deemed "consistent-with" GSR, while a particle consisting of only one element is identified as a "single consistent particle." Id.

From the two samples taken by Corporal Kuntzi of Mr. Pearsall's hand, Mr. Schwoeble found one particle "unique" to GSR, four "consistent-with" particles, and 14 single component particles. (Tr. 92, D.I. 18). Mr. Schwoeble's expert report concluded that the particles found on Mr. Pearsall's hands could have resulted from the discharge of a firearm, being in close proximity to a firearm, or coming in contact with a surface contaminated with GSR. (Tr. 88, D.I. 18). While aware of the fact that police stations, vehicles, handcuffs and holding rooms were typical environments that come into contact with gunshot residue, Mr. Schwoeble noted that there are very few "unique" particles found under any of those conditions. (Tr. 100).

Mr. Kilty, Mr. Pearsall's expert witness, testified that he did not believe one particle of "unique" gunshot residue could be conclusively associated with a shooting in a housing complex, but did not offer an opinion on whether a single particle could be sufficiently associated with possessing a handgun. (Tr. 112). Thus, the experts did not dispute the methods of the testing or

the laboratory findings, but instead disputed the relevance and significance of finding a single particle.

In addition to examining the samples from Mr. Pearsall's hands, Mr. Schwoeble also tested the handgun taken from Ms. Baez for GSR, personally taking two samples from the handgun. (Tr. 87-88). The first sample yielded more than twenty-four "unique" particles and approximately seventy particles that were "consistent with" or single component particles. (D.I. 18). The second sample showed more than twenty-three "unique" particles, and approximately two hundred "consistent with" or single component particles. Id.

**IV. CONCLUSIONS OF LAW**

    A.    <u>Whether Evidence Obtained As A Result Of Mr. Pearsall's Arrest Is Admissible</u>

The Fourth Amendment to the United States Constitution protects "the right of the people to be secure against unreasonable searches and seizures . . . ." U.S. Const. amend IV. A defendant who files a motion to suppress ordinarily carries the burden of proof. <u>Rakas v. Illinois</u>, 439 U.S. 128, 130 n. 1 (1978). However, where a search is conducted without a warrant, as is the case here, the burden shifts to the Government to demonstrate by a preponderance of the evidence that the search was conducted pursuant to one of the exceptions to the warrant requirement. <u>See</u> <u>United States v. Herrold</u>, 962 F.2d 1131, 1137 (3d Cir. 1992). Generally, for a search to be reasonable under

the Fourth Amendment, it must be effectuated with a warrant based on probable cause," unless it falls under an exception to the warrant requirement. See United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002). Evidence obtained pursuant to a warrantless search that does not meet an exception to the warrant requirement must be suppressed as "fruit of the poisonous tree." United States v. Brown, 448 F.3d 239, 244 (2006)(citing Wong Sun v. United States, 371 U.S. 471, 487-88 (1963)).

Police are vested with constitutional authority to conduct a limited, warrantless, investigatory stop in a public place if an officer has a reasonable suspicion of criminal activity. See Terry v. Ohio, 392 U.S. 1 (1968); United States v. Sokolow, 490 U.S. 1, 7 (1989); United States v. Roberson, 90 F.3d 75, 76 (1996). Reasonable suspicion requires that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Brown, 448 F.3d at 246 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." Cortez, 449 U.S. at 417. While Fourth Amendment jurisprudence demands particularized suspicion, courts also recognize that officers must be allowed "to draw on their experience and specialized training to make inferences from and deductions about the cumulative information

available to them that might well elude an untrained person." United States v. Arvizu, 534 U.S. 266, 273 (2002); see also Brown, 448 F.3d at 446; United States v. Nelson, 284 F.3d 472, 476 (3d Cir. 2002). Reasonable suspicion is to be viewed from the vantage point of a "reasonable, trained officer standing in [the detaining officer's] shoes." Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir. 2003). Whether the police have reasonable suspicion is determined from the totality of the circumstances. Cortez, 449 U.S. at 417.

In the instant case, viewing the totality of the circumstances in light of the officers' experience and training, the Court concludes there was a reasonable basis for the officers to believe that Mr. Pearsall and his companions were engaged in criminal activity, and therefore, the initial stop was justified. While the first anonymous tip that initially directed the officers to Capital Green in search of "Kevin Pearsall" may have been insufficient standing alone, several additional factors contributed to the reasonableness of the officers' belief, and ultimately led to corroboration of that tip. Five days before the arrest in question, Corporal Kuntzi arrested Mr. Pearsall on an outstanding warrant issued by the Superior Court for the State of Delaware for a violation of probation. At that time, Corporal Kuntzi learned that Mr. Pearsall was banned from Capitol Green, a ban which Corporal Kuntzi understood to be permanent. Thus,

Corporal Kuntzi reasonably believed that Mr. Pearsall was trespassing. Moreover, as the officers were approaching Mr. Pearsall and Ms. Baez, and before any actual or constructive arrest took place, Officer Bumgarner observed a suspicious bulge in Ms. Baez's shorts. When Ms. Baez grabbed at the bulge in her waistband, the officer's information and suspicion that a gun was present was heightened, and confirmed once the gun was recovered from Ms. Baez. At that point, the anonymous caller's information was sufficiently corroborated. Specifically, the anonymous caller had initially identified Mr. Pearsall by first and last name, accurately described what he was wearing, and reported that he had fired "five" shots into the air, thus evidencing possession of a gun. The second call from the same caller advised that Mr. Pearsall had passed his gun to a woman wearing the same clothing as Ms. Baez and gave the address at which Mr. Pearsall and Ms. Baez would be sitting, i.e. 459 Newcastle Drive.

In light of these facts, the Court concludes that the officers were justified in arresting Mr. Pearsall and conducting a gun powder residue search incident to the arrest. Having found Kevin Pearsall at 459 Newcastle Drive, wearing a white t-shirt and shorts, sitting next to a woman wearing a white t-shirt and shorts who was found to be in possession of a firearm, the police reasonably relied on the last aspect of the caller's report, that Mr. Pearsall initially possessed and fired the gun, but had

passed it to Ms. Baez. In the Court's view, Corporal Kuntzi had an objectively reasonable belief that Mr. Pearsall was prohibited from possessing a firearm, due to Mr. Pearsall's status as a felon and probationer.[4] The information given by the anonymous caller suggesting Mr. Pearsall was in possession of and firing a firearm, the recovery of a firearm from Ms. Baez, and Corporal Kuntzi's reasonable belief that Mr. Pearsall was prohibited from possessing a firearm and trespassing, amounted to probable cause to arrest Mr. Pearsall for illegal possession of a firearm.

Accordingly, because the Court concludes the arrest of Mr. Pearsall was lawful, the Court concludes that the gunshot residue testing of Mr. Pearsall and the handgun recovered from Ms. Baez were not obtained in violation of the Fourth Amendment, and has denied Mr. Pearsall's Motions To Suppress Evidence Obtained From An Illegal Seizure (D.I. 15, 24).

    B.   The Admissibility Of The Government's Expert Reports And Testimony

An expert may offer scientific, technical, or other specialized testimony only if that testimony is (1) based upon sufficient facts or data; (2) the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. In

---

[4] Corporal Kuntzi's arrested Mr. Pearsall on August 1, 2006, for an outstanding warrant for a probation violation, issued by the Superior Court for the State of Delaware, which is a court of felony jurisdiction.

addition to the requirements set forth in Rule 702, the Supreme Court also directed district courts, in Daubert v. Merrell Dow Pharmaceuticals, Inc, to perform a "gatekeeping" function by determining the reliability of expert testimony. The Daubert decision instructs courts to flexibly consider a number of factors, including but not limited to: (1) whether the theory or technique has been tested; (2) whether the technique or theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the general acceptance of the theory. Daubert, 509 U.S. at 593-94; see also In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 n.8 (3d Cir. 1994). In applying these factors, a court must "solely focus on the principles and methodology, not on the conclusions they generate." Daubert, 509 U.S. at 595.

Considering these factors in light of Mr. Schwoeble's expert opinions, the Court concludes that the results of the GSR testing, and Mr. Schwoeble's accompanying testimony, are admissible. Mr. Schwoeble's testing methodology soundly employed scientifically based techniques for identifying GSR that are used by various law enforcement departments and that meet the requirements set forth in Fed. R. Evid. 702 and Daubert, and Kuhmo Tire Co. V. Carmichael, 526 U.S. 137 (1999). Mr. Pearsall has advanced several arguments challenging Mr. Schwoeble's conclusions, but not the methodology of the testing itself. The

Court finds that Mr. Pearsall's challenges go to the weight of the testimony, not the admissibility of the testing. Accordingly, the Court has denied Mr. Pearsall's Motion To Request A Daubert Hearing (D.I. 14).

## V.  CONCLUSION

For the reasons discussed, the Motion To Request A Daubert Hearing (D.I. 14) and the Motions To Suppress Evidence Obtained From An Illegal Seizure (D.I. 15, 24) filed by Defendant have been denied.

An Oral Order consistent with this Memorandum Opinion was issued May 18, 2007.